UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ESTATE OF RITA GENECIN, by
VICTOR GENECIN, Personal
Representative,
        Plaintiff,

VS.

PAUL GENECIN and VICTOR GENECIN,
in his individual capacity,
        Defendants.

CIVIL NO.3:01CV00211(MRK)

MAY 14, 2004

## MOTION IN LIMINE OF PLAINTIFF ESTATE OF RITA GENECIN TO PRECLUDE TESTIMONY OF GREGORY GENECIN

Plaintiff hereby moves to preclude Gregory Genecin, the son of defendant Paul Genecin, from testifying as to statements made in his presence by Rita Genecin concerning the gift of the Lautrec lithograph to defendant Paul Genecin.

Gregory Genecin, one of the minor sons of defendant Paul Genecin is the third-listed defense witness on Defendant's List of Witnesses in the Joint Pretrial Memorandum, filed herewith. The proffer reads:

> It is anticipated that [Gregory]Genecin may testify concerning statements made by Rita Genecin in his presence concerning the gift of the Lautrec to [Paul]Genecin.

The testimony of Gregory Genecin should be precluded, however, pursuant to the Maryland Dead Man's Statute, and because it is hearsay.

Although Gregory is not a named party herein, his testimony is barred by the Maryland Dead Man's Statute. For the purposes of that law, "a party is one who has an interest in the property sought," even if not named in the lawsuit. Farah v. Stout, 112 Md. App. 106, 117, 684 A.2d 471, 476 (Md.App. 1996).

Gregory has a direct interest in the Lautrec, in that he is the named beneficiary of a document executed by Rita Genecin purporting to give him a 1/15 share of the lithograph. PX 8

(copy attached). His mother, Victoria Morrow, stated in her deposition testimony that, in the event her husband should not prevail on his claim to own 100% of the Lautrec, she and her family will pursue claims pursuant to the fractional share documents.  Morrow Deposition at 42. Indeed, in defendant's motion for summary judgment, defendant asked the award of fractional shares of the Lautrec to him and his family as alternative relief to the award to him of the entire lithograph.

As a person with an interest in the property that is the subject of this litigation, Gregory is not a competent witness, and his testimony must be precluded. To support his claim of an *inter vivos* gift against the Estate of Rita Genecin, defendant Paul Genecin is limited to "testimony from disinterested persons," Reddy v. Mody, 39 Md. App. 675, 679, 388 A.2d 555, 559 (Md. Sp. App. 1978), a category to which Gregory Genecin does not belong.

In addition, the entirety of Gregory's proffered testimony is "statements made by Rita Genecin in his presence concerning the gift of the Lautrec."  All such testimony is hearsay not within any exception.  Federal Rule of Evidence 801 (c); see  Farah, 112 Md. App. at 119-121, 864 A.2d at  477-8.

THE PLAINTIFF,
ESTATE OF RITA GENECIN, and DEFENDANT VICTOR GENECIN, in his individual capacity


By   /s/David L. Belt
      David L. Belt (ct 04274)
      JACOBS, GRUDBERG, BELT & DOW, P.C.
      350 Orange Street
      New Haven, CT 06503
      Tel.:(203) 772-3100
      Fax:(203) 772-1691
      Email: dbelt@jacobslaw.com
      Their attorney

## Certification

The undersigned hereby certifies that a copy of the foregoing motion was faxed and mailed first class, postage prepaid, on May 14, 2004 to:

Patrick M. Noonan
Delaney, Zemetis, Donahue, Durham & Noonan, P.C.
741 Boston Post Rd.
Guilford, CT 06437

                            /s/David L. Belt
                            David L. Belt

January 6, 2000

**I**, RITA GENECIN, the undersigned, hereby gift a 1/15th interest in the following piece of art to GREGORY GENECIN, my grandson.
    Henri de Toulouse-Lautrec, French (1864-1901)
    *Partie de campagne,* color lithograph. 1897. Delteil219,
    Adhemar 322, Adriani 228, Wittrock 228.
    Numbered 20 from the edition of 100. With Lautrec's orange-red
    monogram stamp (Lugt 1338). A fine impression in fine condition. Framed.

This gift is unencumbered and is not subject to any conditions or restraints.

_____       <u>Jan. 12, 2000</u>
Rita Genecin, Donor          Date
\

5616 Cross Country Boulevard Baltimore, MD 21209

STATE OF MARYLAND, COUNTY OF BALTIMORE, TO WIT: II

I HEREBY CERTIFY, that on this 12 day of January, 2000, before me, the subscriber, a Notary Public of the State aforesaid, personally appeared Rita Genecin and she acknowledged the above to be her act and deed.
AS WITNESS my hand and Notarial Seal.

                                      <u>Carol N. Sullivan</u>
                                        Notary Public
My Commission Expires: 2-1-02

```
 1 UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

 3

ESTATE OF RITA GENECIN, by    CIVIL ACTION NO.
 4 VICTOR GENECIN, Personal   301 CV 00211 (MRK) Representative
 5
vs.
 6
PAUL GENECIN and VICTOR GENECIN,    DECEMBER 10, 2003
 7 in his individual capacity --
 8
 9
10 Deposition of VICTORIA R. MORROW, M.D., taken
11 in accordance with the Federal Rules of Civil Procedure !
12 at the law offices of Jacobs, Grudberg, Belt & Dow,
13 P.C., 350 Orange Street, New Haven, Connecticut, before
14 Peggy McKie, Notary Public in and for the State of
15 Connecticut, on Wednesday, December 10, 2003,
16 commencing at 12:20 p.m.
17
18
19
20 Peggy McKie, License No. 00175
Registered Professional Reporter
21

22 DEL VECCHIO REPORTING SERVICES, LLC PROFESSIONAL SHORTHAND REPORTERS

117 RANDI DRIVE
MADISON, CT 06443
25 (203) 245-9583
DEL VECCHIO REPORTING SERVICES, LLC _.
```

```
 1 letters.
 2 Q. Have you ever seen it before?
 3 A. I've seen the originals.
 4 Q. When did you see the originals?
 5 A. I really wouldn't be able to tell you. I'm
 6 sure I've seen them a lot of times now.
 7 Q. Would you turn to A-13? This document
 8 purports to be a gift to you personally, Victoria
 9 Morrow, of a 1/15th interest in the Lautrec.
10 A. Um-hmm.
11 Q. Is it your understanding that this gives
12 you a 1/15th interest in the Lautrec?
13 MR. NOONAN: Are you asking for a
14 legal opinion?
15 A. Yeah, I think that's going to be the
16 outcome of the litigation. I don't think that's for me
17 to say.
18 I did not see this letter or know about it
19 until afterwards, till.after she died, and till after
20 Paul --Paul didn't know about these four letters
21 either until after she died.
22 BY MR. MATTIACCIO:
23 Q. Have you ever asserted an interest in
24 1/15th of the Lautrec, based on this document or 25 anything else?
```

DEL VECCHIO REPORTING SERVICES, LLC

1 A. I think that this is a complex legal
2 question which will be resolved in the Connecticut
3 litigation.
4 Q. I'm just asking you if you've ever made a
5 claim.
6 A. I think that there --on a contingent
7 basis, if we're not given the whole Lautrec, there will
8 be claims for the 4/15ths, if that's what you're asking
9 about.
10 Q. And the claims for the 4/15ths would be
11 1/15th each to Paul, yourself, and each of your two
12 children, is that right?
13 A. On a contingent basis, if we're not granted
14 the whole picture to Paul, which is what we really feel
15 is right.
16 Q. And if Paul is granted the 100 percent
17 interest in the Lautrec, you will not have any claim –
18 A. Right.
19 Q. --for a 15th, is that correct?
20 A. Right.
21 Q. Is that also true for your children?
22 A. Yeah.
23 Q. How did you first learn of Rita Genecin's
24 death?
25 A. We were called by a friend of hers in the

DEL VECCHIO REPORTING SERVICES, LLC

```
 1 looking for an answer to the --and were concerned
 2 about not getting an answer to your IRA, your proposal
 3 for escrowing the IRAs and distributing them. And I '-,
 4 wanted to assure you that we were working on it, and
 5 that we would answer you. I didn't want you to have no
 6 answer at all. In order to be polite to you and let
 7 you know that we were receiving your e-mails. They
 8 weren't going nowhere.
 9 BY MR. MATTIACCIO:
10 Q. Was Mr. Greber still representing Paul
11 Genecin at this time?
12 A. Yes.
13 Q. And is there a reason why Mr. Greber didn't ,.
14 send me the content of this e-mail?
15 A. Yes. I told him that I wanted to take up
16 the communications.
17 Q. And why did you want to take up the
18 communications at that point?
19 A. I think that that's the most direct way to
20 do things, and it leaves the least room for
21 miscommunication.
22 Q. And on what basis were you taking up the
23 communications rather than Paul? --
24 A. Paul was not well, or he was intermittently
25 well, and he asked me if I would take this over for him
```

DEL VECCHIO REPORTING SERVICES, LLC

```
1  for some period of time.
2  Q. And did he give you some written
3  authorization to act on his behalf?
4  A. Yes.
S  Q. May I see a copy of it, please?
6  A. No. I don't have it with me. I don't
7  carryall that around.
8  MR. MATTIACCIO: I'm going to call for
9  its production.
10 MR. NOONAN: I think we discussed this
11 with the judge, Richard, and the judge
12 agreed that you're not entitled to it. But
13 if you want to make a production request,
14 we'll respond to it.
15 MR. MATTIACCIO: Consider this a
16 request.
17 MR. NOONAN: Okay. I actually can't
18 consider it a request. There's a way to
19 make a production request, and I think you
20 and I both know how to do that. So if you
21 want it, you need to make a request. But
22 the judge did address this. I'm not sure
23 why we're wasting further time on it.
24 BY MR. MATTIACCIO:
25 Q. Now, you say in your e-mail to me that Paul
```

DEL VECCHIO REPORTING SERVICES, LLC

```
 1 has been ill, and Dave has been unable to communicate
 2 with him?
 3 A. Right.
 4 Q. What was Paul's illness? ,--
 5 A. It's not --
 6 MR. NOONAN: Objection.
 7 A. It's not your business.
 8 MR. NOONAN: We clearly went over this
 9 with the judge, and you know you're not
10 entitled to that. So if you have other
11 questions that are relevant to the case
12 that are not privileged, you ought to ask
13 them. We only have ten minutes left.
14 MR. MATTIACCIO: Well, as I suggested ~.
15 in my e-mail to you earlier today, I'd be
16 perfectly happy to take a break and
17 continue after Dr. Morrow picks up her son.
18 MR. NOONAN: I didn't get any such
19 e-mail. I was in court. But we're not
20 able to continue today. As I told you in
21 my voice mail last night and e-mail this
22 morning, we have to leave about quarter of
23 three. And it does appear to me that
24 you're finished with the relevant matters. -
25 But if you have other things you want to
```

DEL VECCHIO REPORTING SERVICES, LLC

```
1  ask, you have ten minutes to do that.
2  MR. MATTIACCIO: Well, we'll obviously
3  have to take this up with the judge, but I
4  will use my ten minutes.
5  MR. NOONAN: Okay.
6  MR. MATTIACCIO: I would ask the
7  reporter to mark as Exhibit HH an e-mail
8  from Max Blumenthal dated November 23rd,
9  2003.
10 (E-mail dated 11-23-03 from Max
11 Blumenthal marked Plaintiff's Exhibit HH
12 for identification.
13 BY MR. MATTIACCIO:
14 Q. Now, Dr. Morrow, attached to this e-mail is
15 a copy of a letter from you, or an e-mail from you, to
16 Mr. Blumenthal. Did you compose this letter?
17 A. Yeah.
18 Q. There are seven, eight, nine, ten --there
19 are ten numbered points in this e-mail regarding the
20 specifics of the estate. We don't have time to get
21 into each and everyone of them.
22 My question to you is, did you prepare
23 those portions of this letter?
24 A. Did I draft the letter? Yes.
25 Q. And you sent the letter to Mr. Blumenthal
```

```
1 expecting an answer from Mr. Blumenthal directly to
2 you, is that right?
3 A. Gee, I don't remember. I guess so.
4 Q. Did Paul Genecin have any contribution to
5 the content of this letter at this point when you were _.
6 drafting it?
7 A. Well, he knew the full content and agreed
8 with the full content, and he typed it.
9 Q. He was typing it? Were you dictating it
10 for him?
11 A. Yeah.
12 Q. To him?
13 A. Yeah.
14 Q. And he was taking it down?
15 A. (Nodding head up and down.)
16 Q. Is that --I'm sorry, one more time?
17 A. Yes. That's the way we generally write.
18 Q. SO his correspondence generally in this
19 case has been dictated by you?
20 A. No, no, not generally in this case. But
21 when I write a paper or something like that, and he's
22 typing for me --I don't type --when he's typing
23 something for me, I read it, and he types it. 24 Sometimes he edits it as he types.
25 Q. Do you recall any occasions when you were
```

```
1 drafting with him in this way when he was writing
2 letters to Victor?
3 A. I'm sure. There were many, I'm sure, that
4 I would read it, and he would type it, and then he
5 would edit it and review it.
6 Q. And you would give your input?
7 A. And then --well, I'd give my input, and he
8 would redraft it and rewrite it sometimes.
9 MR. MATTIACCIO: I'm going to ask the
10 reporter to mark as II an e-mail from David --
11 Greber to Richard Mattiaccio dated November
12 24th, 2003.
13 (E-mail dated 11-24-03 to Richard
14 Mattiaccio from David Greber marked
15 Plaintiff's Exhibit II for identification.)
16 BY MR. MATTIACCIO:
17 Q. Do you recognize this e-mail from
18 Mr. Greber? And I'm just going to be asking you about
19 the top part.
20 A. The top part? -0.
21 Q. Right.
22 A. Yeah.
23 Q. When did you receive it? I see you were
24 cc'd on it. So you received it simultaneously?
25 A. Whatever you say. I don't know. I mean, I
```

DEL VECCHIO REPORTING SERVICES, LLC

```
 1 don't always look at my e-mails the same day they come
 2 in, by the way. I don't sit at my desk every day.
 3 Q. Now, Mr. Greber says to me here that he
 4 received word from you that you had been designated by
 5 Paul in writing to handle his decision-making during
 6 the period of his illness. Is that correct?
 7 A. Um-hmm. Yes.
 8 Q. And did you provide that writing to
 9 Mr. Greber?
10 MR. NOONAN: Objection.
11 Attorney-client communication.
12 MR. MATTIACCIO: I'm not asking the
13 content, I'm just asking whether or not
14 Mr. Greber has it.
15 MR. NOONAN: Well, I object.
16 MR. MATTIACCIO: Are you directing the
17 witness not to answer?
18 MR. NOONAN: I'm objecting. Why don't
19 you ask a question that has some relevance
20 to the subject matter of the case? These
21 e-mails relate to estate issues in
22 Maryland, not to this case.
23 MR. MATTIACCIO: Well, obviously, we
24 don't agree with that.
25 MR. NOONAN: All right. Well, go
```

DEL VECCHIO REPORTING SERVICES, LLC

```
 1 ahead. What's your next question? -
 2 BY MR. MATTIACCIO:
 3 Q. What was the reason why you were unable to
 4 attend your deposition last Friday?
 5 A. I was sick and scheduled for testing.
 6 MR. NOONAN: And we're not going to be
 7 disclosing the nature of her illness.
 8 BY MR. MATTIACCIO:
 9 Q. When did you learn you were sick and
10 scheduled for testing?
11 MR. NOONAN: You're asking when she .-
12 first became ill?
13 BY MR. MATTIACCIO:
14 Q. When did you first --
IS A. You know, I really think you're treading on
16 the territory of the history of my illness and of my
17 care, and I think thatls probably confidential and
18 privileged.
19 MR. NOONAN: The judge asked us to get
20 a letter from her physician, which I
21 requested, and weill be providing that when
22 we receive it.
23 MR. MATTIACCIO: Okay. In that case,
24 I have to reserve my right to ask the
25 witness questions about that once I receive
```

DEL VECCHIO REPORTING SERVICES, LLC

```
1  the letter.
2  MR. NOONAN: Well, I don't think
3  you're going to be asking her questions
4  about her medical history once you receive
5  the letter without an order.
6  MR. MATTIACCIO: Apparently so. –
7  I'm going to ask the reporter to mark
8  as Exhibit JJ an e-mail from Paul Genecin
9  to Mr. Blumenthal dated December 6th, 2003.
10 (E-mail dated 12-6-03 to Max
11 Blumenthal from Paul Genecin marked
12 Plaintiff's Exhibit JJ for identification.)
13 MR. MATTIACCIO: I'm going to ask the
14 witness if she recognizes –
15 BY MR. MATTIACCIO:
16 Q. Do you recognize this document? ~.
17 A. Yeah.
18 Q. When did you see it for the first time?
19 A. Probably when it was written.
20 Q. This one is signed "Paul Genecin"?
21 A. Right.
22 Q. Did Paul Genecin type this?
23 A. Yes.
24 Q. Did you dictate it?
25 A. I don't remember this one, whether I had
```

DEL VECCHIO REPORTING SERVICES, LLC

```
1  any part in drafting it, or whether he drafted it and I
2  looked at it after. But I think most of these letters
3  that youlve shown us today I had some knowledge of at
4  the time they were being written.
5  Q. And where was Paul Genecin when he typed
6  this, if you know?
7  A. At our home computer.
8  MR. MATTIACCIO: Let's take a break.
9  (Recess.)
10 MR. MATTIACCIO: We have no further
11 questions at this time. As I said, we
12 reserve --once we've seen the doctor's
13 report, then weill take it up with the
14 judge if we feel we need to.
15 MR. NOONAN: Okay, good.
16 MR. MATTIACCIO: Thank you all.
17 (Whereupon, the deposition was
18 adjourned at 2:45 p.m.)
19
20 + + +
21
22
23
24
25
```

DEL VECCHIO REPORTING SERVICES, LLC

```
STATE OF CONNECTICUT}
                              Ss:
COUNTY OF NEW HAVEN}

3

4 I, Peggy McKie, a Notary Public for the State
5 of Connecticut, do hereby certify that the deposition
6 of VICTORIA R. MORROW, M.D., was taken before me
7 pursuant to the Federal Rules of Civil Procedure at the
8 law offices of Jacobs, Grudberg, Belt & Dow, P.C.,
9 350 Orange Street, New Haven, Connecticut, commencing
10 at 12:20 p.m. on Wednesday, December 10, 2003.
11 I further certify that the witness was first
12 sworn by me to tell the truth, the whole truth, and
13 notping but the truth, and was examined by counsel, and
14 her testimony was stenographically reported by me and
15 subsequently transcribed as hereinbefore appears.
16 I further certify that I am not related to
17 the parties hereto or their counsel, and that I am not -'
18 in any way interested in the event of said cause.
19 Dated at Madison, Connecticut, this 11th day
20 of December, 2003.
21
```

<u>Peggy McKie</u>
Notary Public
24

25 My commission expires November 30, 2008.

DEL VECCHIO REPORTING SERVICES, LLC ".