UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ESTATE OF RITA GENECIN, by      :
VICTOR GENECIN, Personal       :
Representative,                     :
      Plaintiff,                :       Civil No. 3:01CV00211(MRK)
                             :
VS.                         :
                             :
PAUL GENECIN and VICTOR GENECIN,  :
in his individual capacity,        :
      Defendants.           :       JANUARY 18, 2005

## DEFENDANT PAUL GENECIN'S POST-TRIAL BRIEF

This case involves a most unfortunate dispute between two brothers over how to divide their deceased mother's assets. It is submitted that the Court's guiding principle should be to ascertain and then follow the intentions of the mother. Indeed, all of the rules which have been devised by the courts relating to gifts, wills, trusts and estates were designed to insure that the intentions of the donor are carried out. If that principle is applied in this case, the Court should enter an order that the Lautrec belongs to Paul Genecin and an order that the IRA be divided equally between the two brothers.

I.      **THE LAUTREC**

Under Maryland law there are three elements to establish a valid gift: donative intent, delivery, and acceptance. Hamilton v. Caplan, 518A.2d 1087, 1090-01 (Md. 1997). The first element – donative intent – appears to be undisputed. Indeed, Victor Genecin himself admitted

**DONAHUE, DURHAM & NOONAN, P.C.**
Concept Park  •  741 Boston Post Road
Guilford, Connecticut 06437
Tel: (203) 458-9168 • Fax: (203) 458-4424
Juris No. 415438

that it was his mother's intention that Paul Genecin and/or his family should ultimately own 100% of the Lautrec.  (Trial transcript at pp. 383-384).[1]

The testimony of Ms. Sherlock and Gregory Genecin also establish donative intent. Ms. Sherlock testified – credibly – that she specifically recalled speaking with Mrs. Genecin in the spring of 2000 about the Lautrec.  She noticed that Mrs. Genecin had recently changed the location of the Lautrec to a different place in her home, and Mrs. Sherlock commented on it. Mrs. Genecin responded that she would have to find something else to put in that location, since she had given the Lautrec to her son Paul as a Christmas gift.  (Trial transcript at p. 495). Mrs. Sherlock was a close friend of Rita Genecin; she lived half a block away and saw Mrs. Genecin frequently.  (Trial Transcript at pp. 491-92).  She had no reason to testify about this matter other than her long friendship with Rita Genecin, and her desire to see Mrs. Genecin's wishes carried out.  (Trial Transcript at p. 496).  Mrs. Sherlock testified unequivocally that she had been informed by Rita Genecin that she had given the Lautrec to her son, Paul, for Christmas.  (Trial Transcript at p. 509).

Similarly, Gregory Genecin testified – credibly – that he had a vivid recollection of the last time he spent at his grandmother's home during her life.  He testified that he specifically

---

[1] In light of this admission, the amount of time spent during the trial by plaintiff's counsel on the subject of the correct name of the Lautrec is inexplicable.  Plaintiff seems to be suggesting that his brother had committed forgery with respect to the deed of gift for the Lautrec, calling attention to the fact that the deed referred to the Lautrec as being "signed" rather than "stamped" and the fact that the formal name of the  lithograph was not used. Given plaintiff's admission that the document appears to  bear his mother's signature, it is difficult to understand this baseless accusation.  Indeed, plaintiff's complaint, drafted by the plaintiff himself, refers to the Lautrec by the alternate names "Partie De Campagne" and "Le Chariot Anglais."  See Complaint, ¶30.  Furthermore, plaintiff's counsel stipulated at trial that the description of the Lautrec provided by Gregory Genecin was adequate to identify it as the artwork that is at issue in this litigation.  (Trial Transcript at p. 529).

recalled his grandmother telling him that she had given the Lautrec to his father, not to his father and the rest of the family.  (Trial transcript at p.521). Gregory Genecin had spent the day at the Smithsonian looking at pieces of art with his grandmother.  She later showed him the artwork she had in her house, and told him that she had given the Lautrec to Paul Genecin for Christmas.  (Trial Transcript at pp. 520-21).

Victor Genecin was unable to point to any conversations he had with his mother concerning the Lautrec.  He offered three pieces of evidence in an effort to counter the strong evidence of donative intent.  None of that evidence was persuasive.  First, Victor Genecin offered an e-mail from Paul Genecin dated October 10, 2000 which contains the following statement:

> "I feel that the Lautrec is not in the estate, although I cannot explain why Mother wrote four letters gifting four fifteenths to my family two days after gifting it to me in its entirety.  I'm guessing that she told Dan Wagner what she did and he told her to do it differently.  She spoke to me about the Lautrec on many occasions, most recently in July - and always referred to it as mine.  She also explained something - I don't recall details - about making the ownership of the house joint between you, me and her to permit her to live with the works of art after she had given them away.  She told this to me in July *a propos* of the Lautrec." (PX 25)

Assuming that plaintiff has conceded that the statements in this e-mail are admissible,[2] this e-mail supports the notion that Mrs. Genecin had decided given the Lautrec to her son, Paul.

The second piece of evidence offered in an attempt to counter the evidence of donative intent was the suggestion that the fractional deeds of gift (Victor Genecin Exhibits 5, 6, 7 and 8) negated Mrs. Genecin's intent.  However, Victor Genecin himself debunked that theory.  He

---

[2] Plaintiff has previously taken the position that Paul Genecin's comments about statements made by his mother are barred by the dead man's statute.  If those statements are barred, then this exhibit also may not be considered.  On the other hand, if this exhibit is to be admitted, then the testimony of Dr. Genecin should also be admissible.

acknowledged that the very reason for the creation of the fractional deeds of gift was to ameliorate the gift tax implications of the gift of the Lautrec. (Trial transcript at p. 384). As noted above, Victor Genecin acknowledged that his mother intended that Paul Genecin should have 100% of the Lautrec. (Trial transcript at pp. 383-384).[3] The testimony of Ms. Sherlock and Gregory Genecin demonstrate that Mrs. Genecin thought that she had already made an effective gift; she told both of them in the spring of 2000 that she <u>had already given</u> the Lautrec to Paul. Thus, donative intent has been established.

It is unclear whether plaintiff is still challenging the gift on the ground that it was not accepted. Under Maryland law acceptance is "presumed until the contrary is shown." <u>Allender v. Allender</u>, 199 Md. 541, 546, 87A. 2d 608 (1952). The only evidence offered with respect to acceptance was the testimony of Paul Genecin. While he testified about the reasons why it was impractical for him to remove the Lautrec from the home he jointly owned with his mother and brother in Baltimore, he categorically denied that he rejected the gift. Based on the advice his mother had received from her financial advisor, it was Paul Genecin's belief that there was no urgency in moving the Lautrec out of the Baltimore residence in light of the fact that Paul Genecin was a co-owner of the residence. (Trial transcript at p. 645.) Even if the plaintiff in this case had offered evidence of non-acceptance of the gift, there is no case law of which defendant is aware which would compel this Court to reject the testimony of the defendant

---

[3] The suggestion by Victor Genecin that this gift was intended to include Paul Genecin's family was contradicted by Victor Genecin himself given the fact that he acknowledged that the reason for the creation of fractional deeds of gift was to eliminate any gift tax. (Trial transcript at p. 384) The testimony of the financial advisors was to the same effect. Thus, Mr. Wagner recalled that in late 1999 Mrs. Genecin told him that she wanted Paul Genecin (not his family) to have the Lautrec. (Trial transcript at p. 157). Similarly, Mr. Hertzberg testified that when Mrs. Genecin first talked about it in the fall of 1999, she indicated that she wished to make gifts of art "to her sons." (Trial transcript at p. 292.)

4

under the Dead Man's Statute in circumstances where the plaintiff has offered evidence of non-acceptance of the gift.  Paul Genecin testified unequivocally that he accepted the gift.  Thus, under Maryland law, acceptance has been established.

Much of plaintiff's argument centers on the requirement of delivery under Maryland law.  As noted in the numerous briefs previously filed in this case,[4] Maryland law does not require transfer of physical possession in all cases.  Numerous cases have affirmed that the requirement of delivery may be satisfied through some other means, e.g. delivery of an instrument.  In the present case, the evidence demonstrates – even without reference to Paul Genecin's testimony – that Mrs. Genecin signed a deed of gift which she delivered to her son Paul.  This alone would be sufficient to constitute the delivery requirement under Maryland law.  A second and independent rationale for satisfying the delivery requirement is the fact that Mrs. Genecin, on the advice of her financial advisor, made her sons co-owners of her house so that the gifts of artwork which would remain temporarily in the home in Baltimore would be validated.  Defense counsel has been unable to locate any case under Maryland law which would invalidate the gift under these circumstances.

There is no doubt that the 100% deed of gift (DX501) contains the signature of Rita Genecin.  Victor Genecin himself acknowledged that the signature on that document (and on numerous others) appeared to be that of his mother.  (Trial transcript at pp. 379-380).  Victor Genecin also testified that DX507, which is a deed of gift from Rita Genecin to Paul Genecin

---

[4]In view of the numerous legal briefs already filed in this matter, defendant will refrain from repetition of the legal citations made in the prior briefs, but continues to rely on the arguments contained in those memoranda.

bearing the date January 4, 2000 – the same date as the 100% gift of the Lautrec – also appears to have been signed by his mother.  (Trial transcript at p. 379).  As noted in prior briefs, where there is no dispute over a matter, the Dead Man's Statute does not prohibit testimony from the donee on the matter.  In this regard, Paul Genecin testified that his mother on numerous occasions had asked him to prepare a gift letter which she would dictate to him.  (Trial transcript at p. 569).[5]  Like his brother, Paul Genecin is able to recognize his mother's handwriting from having seen it numerous times on the gift letters, checks and other items.  (Trial transcript at pp. 573-575).  DX511 consists of photocopies of checks from Rita Genecin's bank account, which contains numerous exemplars of her signature.  (Trial transcript at p. 575).

In the absence of any dispute over the genuineness of Rita Genecin's signature on the deed of gift, it appears clear that the real dispute in this case is whether the requirement of delivery was met under Maryland law.  In this regard, Victor Genecin testified that the reason he is not making a claim for the "Hawk Woman" (a painting given to Paul by Rita Genecin through a deed of gift dated the same day as the Lautrec deed of gift), but he is making a claim

---

[5] This consistent pattern of giving works of art through a deed of gift provides further compelling evidence of Mrs. Genecin's donative intent.  See DX 503, 504, 505, 506, 507.  Of course, with regard to the Lautrec, Mrs. Genecin, in an effort to ensure that the gift was validated, actually transferred her house as well as creating the deed of gift.  It would indeed be difficult to imagine more compelling evidence of donative intent than the unequivocal language of the deed of gift coupled with the transfer of title at the suggestion of Mrs. Genecin's financial advisor.  The evidence showed that the procedure utilized by Mrs. Genecin with respect to the Lautrec was the same as numerous other gifts of art to Paul Genecin, in which Mrs. Genecin transferred by deed of gift to be followed later by delivery of the artwork itself.  This pattern of conveyance of gift by deed while retaining physical possession of the property was persuasive evidence to the court in Edinburg v Edinburg, 22 Mass.  App. Ct. 199, 492 N.E. 2nd 1164, 1167 (1986) that an effective gift had been made.

for the Lautrec, is that the "Hawk Woman" was in the physical possession of Paul Genecin at the time of his mother's death, whereas the Lautrec was not.  (Trial transcript at p. 380-381).[6]

In other words, Victor Genecin does not dispute the fact that the deeds of gift for both the Lautrec and the "Hawk Woman", both of which were dated January 4, 2000, were executed by his mother.  That being the case, Maryland law does not prohibit the court from considering Paul Genecin's testimony regarding the creation of the document.[7]  Paul Genecin testified that the first time his mother spoke to him about making a gift of the Lautrec was the summer of 1999 (Trial transcript at p. 623).  His initial response to her was that this was a major gift, and she should not make such a generous gift on the spur of the moment.  (Trial transcript at p. 623).  Later that same year, Mrs. Genecin informed Paul Genecin that she intended to give him the Lautrec for Christmas and asked him to prepare a gift letter to that effect.  She then dictated the letter over the telephone, while Paul Genecin typed it on his computer.  (Trial transcript at p. 624).[8]  Paul Genecin then took two printed copies of that letter to Baltimore and his mother

---

[6] Plaintiff's counsel spent a great deal of time asking questions of both Victor Genecin and Mr. Wagner to establish that Mrs. Genecin had not informed either of them that she had already given the Lautrec to Paul Genecin prior to executing the fractional deeds of gift.  It is unclear what point was being made through this testimony, in light of the fact that both of them testified that Rita Genecin had often made gifts without informing them of the fact.  (Trial transcript at pp. 381-382; 202-204).  Indeed, both of them also testified that they were aware of the fact that Mrs. Genecin had made gifts which exceeded the $10,000 gift tax exclusion, sometimes without informing them.  (Trial transcript at pp. 201, 382).

[7] Paul Genecin's testimony was entirely credible. It should be noted that Paul Genecin acknowledged that he never spoke with his mother about her plans for the IRA account.  (Trial Transcript at p. 653).  This bolsters his credibility with respect to the Lautrec.  If Paul Genecin was willing to fabricate conversations with his mother, it would have been an easy matter for him to testify falsely about conversations with his mother about her plans for the IRA account.

[8] It would seem that the fact that Paul Genecin typed the deed of gift and brought it to his mother for her signature would negate any suggestion that he intended to reject the gift.

signed both originals in his presence. Paul Genecin kept one of the originals of that letter, and gave the other to his mother. (Trial transcript at pp. 624-625). After his mother's death, he found the second original in his mother's files where she kept paperwork relating to her artwork. (Trial transcript at p. 625). At Christmas time, Mrs. Genecin also told Paul Genecin that she either had just deeded the house to him and his brother or had plans to do so in the very near future. (Trial transcript at p. 643). Mrs. Genecin told Paul Genecin that the reason for deeding the house was to insure that the gifts of works of art she was making would be valid. (Trial transcript at p. 643).[9]

Even without resort to the testimony of Paul Genecin, the evidence is clear that the 100% deed of gift was delivered to Paul Genecin. Ms. Mulrine testified that there was one occasion when she notarized Mrs. Genecin's signature when Mrs. Genecin was not present, and she did so at the request of Paul Genecin, who presented her the deed of gift to notarize. (Trial transcript at p. 451). She further testified that, each time she notarizes a document, she places on the document the date she has affixed her notary stamp, irrespective of the printed date on

---

[9] In view of the concession that the signature on the deeds of gift for both the Hawk Woman and the Lautrec appear to be that of his mother, it is unclear why plaintiff felt it necessary to offer evidence concerning the fact that Paul Genecin had all the artwork insured at the time of Rita Genecin's death, without distinguishing whether the artwork at that point belonged to Paul Genecin, Victor Genecin or the Estate. Paul Genecin testified that he did not separately divide the artwork under the names of the Estate, his own name and Victor Genecin's name, because having just experienced his mother's death, he simply was not thinking about separate ownership at that point in time. (Trial transcript at pp. 649-650). Similarly, Paul Genecin was not thinking about ownership of assets during the meeting with Mr. Wagner. At that point, he had been up straight for two nights, was trying to understand his mother's suicide, and had just come from viewing his mother's dead body. (Trial transcript at pp. 651-652). Indeed, Victor Genecin himself that during this meeting he was not concentrating on which of his mother's assets might belong to him, given that he had just learned that his mother had committed suicide and he had just come from viewing his mother's body. (Trial transcript at p. 444). Mr. Wagner also acknowledged that this meeting took place within two or three days of Mrs. Genecin's suicide, and it was therefore not surprising that Paul Genecin did not mention the gift of the Lautrec at that meeting. (Trial Transcript at p. 82).

the document.  (Trial transcript at p. 453).  She stated that she is confident that she placed her notary stamp on the 100% deed of gift for the Lautrec (DX501) on January 4, 2000, just as she is confident she did the same with respect to DX507 (relating to the gift of the "Hawk Woman") on the same date.  (Trial transcript at p. 465).  Ms. Mulrine's testimony in this regard is reinforced by examination of defense exhibits 504, 505 and 506.  Although each of these documents contains a printed date earlier than May 6, 1998, Ms. Mulrine recorded the date on each of them as May 6, 1998, since that is the date she affixed her notary stamp on each of those documents.  (Trial transcript at pp. 453, 456-460).  Ms. Mulrine also testified, credibly, that she had never placed her notary stamp on a document where the document was unsigned. (Trial transcript at pp. 466, 489).  It is thus clear that when Ms. Mulrine received DX501 from Paul Genecin on January 4, 2000, Rita Genecin had already executed the deed of gift.[10]  Thus, the executed deed of gift had already been delivered to Paul Genecin.

In light of the evidence that the Lautrec had already been given away as of January 4, 2000, Mrs. Genecin's financial advisor was correct when he referred to the fractional deeds of gift, executed on January 12, 2000, as a "non-event."  (DX502).  As Mr. Wagner stated: "You can't give away something twice."  (Trial transcript at p. 215).  With respect to the fractional deeds of gift, Victor Genecin himself conceded that if they were never delivered, then under Maryland law they would have no effect.  (Trial transcript at p. 436).  There was no testimony relating to delivery of the fractional deeds of gift, except from Paul Genecin and Gregory

---

[10] While it is true that Ms. Mulrine later indicated that she may have notarized documents for Mrs. Genecin when Mrs. Genecin was not present on more than one occasion, that does not detract from her steadfast statement that she had never placed her notary stamp on a document which was unsigned where the witness was not present. (Trial transcript at pp. 474, 486-87).

Genecin.  Each of them indicated that the fractional deeds were not delivered.  (Trial transcript at pp. 435-36; 521-522; 652).  Thus the fractional deeds of gift are without any legal effect.

While the fractional deeds of gift are not effective under Maryland law to vitiate the 100% gift of the Lautrec to Paul Genecin, they are nevertheless relevant in establishing what Mrs. Genecin wanted to do with the Lautrec, i.e. give it to her son Paul.  Thus, Mr. Hertzberg recalled that Mrs. Genecin in the fall of 1999 stated that she wished to make gifts of artwork "to her sons."  (Trial transcript at p. 292).  Mr. Hertzberg testified that creating the fractional deeds of gift in order to divide the Lautrec up among members of Paul's family was recommended either by Mr. Wagner or by Mr. Hertzberg in order to protect the gift from a gift tax.  (Trial transcript at p. 293).  Accordingly, the signing of the fractional deeds of gift does not negate the 100% deed of gift; rather those documents support the conclusion that Mrs. Genecin's desire was to have her son Paul own the Lautrec.  This desire was so strong that, on the advice of her financial advisor, Mrs. Genecin put her house into the joint names of herself and her two sons in order to validate the gifts of artwork she was making to her sons. (Trial transcript at pp. 63, 159-60).  Similarly, Mr. Hertzberg testified that the ownership of the house was placed in the name of Rita Genecin and her two sons in order to validate the gifts of the artwork to the sons.  (Trial transcript at p. 282).  No case has been cited by plaintiff's counsel which would require that this Court enter an order defeating that intent.[11]

---

[11] Since Victor Genecin never spoke to his mother about the gift of the Lautrec, he offered no testimony on her intention.  However, he did confirm that the signature on the deed of gift for the Lautrec appeared to be that of his mother.

Evidence as to Mrs. Genecin's donative intention with respect to the Lautrec can be summarized as follows.  Consistent with her past practice, she placed her signature on the deed of gift which unequivocally states:

> "This letter is a Deed of Gift, in which I, Rita Genecin, hereby give, grant, convey and transfer all my right, title and interest in and to the item listed below to you, Paul Genecin, in fee simple, absolutely, without any reservations whatsoever:  One signed lithograph by Henri de Toulouse-Lautrec entitled La Chariot Anglais."[12]

Mrs. Genecin stated to two different individuals – one of her closest friends and her grandson – that she had made a gift of the Lautrec to her son Paul.   Mrs. Genecin's two financial advisors testified that, on their advice, Mrs. Genecin transferred her home jointly to herself and her two sons with the specific desire to validate the gifts of artwork she was making to her sons.  Plaintiff's counsel has failed to cite a single case suggesting that the Maryland courts would invalidate the gift under such circumstances.  The cases cited by the plaintiff in his various briefs where gifts were invalidated did not involve a situation where a formal written instrument was signed by the donor indicating donative intent.  The importance of this distinction is obvious.  The purpose of the Dead Man's Statute is to prevent someone from defrauding an estate by the device of claiming that a gift had been made by the decedent, in circumstances where the decedent is unable to confirm or deny the claim.  That concern is simply not present in a case where, as here, there is documentary proof of the gift having been made.  Further, no case under Maryland law has ever held that physical delivery is required in a circumstance where the item is maintained in a house that has been transferred in part to the

---

[12] Since no notarization was required, the fact that Mrs. Mulrine should not have notarized it without having seen Mrs. Genecin actually sign the document is irrelevant.

donee for the specific purpose of effecting the gift.  Under the circumstances, Mrs. Genecin

"had done all she could do" to effectuate this gift. <u>See</u>, <u>Malloy v Smith</u>, 265 Md. 460, 466, 290

A. 2nd 486 (1972).

The plaintiff has offered nothing but the merest conjecture and false allegations of

forgery in response to the overwhelming evidence that Mrs. Genecin made a gift of the Lautrec

to Paul Genecin.  He has offered no evidence to contradict the testimony of Ms. Sherlock and

Gregory Genecin that Mrs. Genecin told them she had already given the Lautrec to Paul

Genecin as a Christmas gift.  He offered no evidence that the fractional deeds of gift were ever

delivered, and he even conceded that if they were not delivered they would have no legal

effect.  The plaintiff certainly has offered no evidence to rebut the transfer of Mrs. Genecin's

house as a way of effectuating the gift, nor has he offered any suggestion that the testimony of

her financial advisors with regard to that matter was inaccurate.  In short, the plaintiff has

offered no evidence to justify frustrating Mrs. Genecin's intent with regard to the Lautrec.

Accordingly, this Court should enter an order that the Lautrec in its entirety belongs to Paul

Genecin.

## II.    <u>THE IRA</u>

As with the Lautrec, it is defendant's view that the intent of Mrs. Genecin should

prevail.   The only testimony offered regarding the intent of Mrs. Genecin came from

Mr. Wagner, and that testimony must be discarded.  It does not seem fruitful to list each and

every reason why Mr. Wagner's testimony on the subject was lacking in credibility; a few

examples will suffice:

- The fact that Mr. Wagner would recall the particular client meeting at all, 5½ years after the events in question, given that he had had a total of 375 client meetings during that time, is itself incredible. (Trial transcript at p. 99). Mr. Hertzberg noted that he had no independent recollection of the time in January, 2000 that Mrs. Genecin signed the IRA papers, in light of the fact that he had had hundreds of meetings with clients since that time and couldn't possibly remember all of them. (Trial transcript at p. 293).

- As the Court itself noted, if indeed Mrs. Genecin had told Mr. Wagner that she wished to repudiate the 50/50 division indicated in the per stirpes document created by her lawyer, it was extraordinary that Mr. Wagner should write a letter to the two brothers after Mrs. Genecin's death suggesting that the IRA be split on a 50/50 basis. (Trial transcript at pp. 73-74; DX 514).

- The Court also noted that it was unusual that the summary judgment papers contained no reference to Mr. Wagner having a conversation with Mrs. Genecin about her intent with respect to dividing the IRA on a 60/40 basis, if Mr. Wagner had had multiple conversations with her on that subject. (Trial Transcript at pp. 70-71).

- Mr. Wagner's trial testimony is inconsistent with the letter he wrote to the two brothers after the discrepancies in the IRA beneficiary documents, in which Mr. Wagner stated: "The facts indicate dual designations, and one could argue for either one." (DX514). If indeed Mr. Wagner had had a conversation in which Mrs. Genecin made it known that she wanted a 60/40 split, it is inconceivable that he would not have advised her two sons of that fact. Indeed, Mr. Wagner himself stated that it was not until December, 2000 that he first became aware of any discrepancy among the various beneficiary designation documents. (Trial transcript at p.166). Nevertheless, Mr. Wagner testified that although he claims that Mrs. Genecin told him she wanted the account divided on a 60/40, he wrote to the two brothers that "one could argue for either interpretation" without informing them of the oral conversations he claims to have had with Mrs. Genecin. (Trial transcript at p. 182).

- In this regard, Mr. Hertzberg denied hearing from Mr. Wagner that Mrs. Genecin wanted a 60/40 split of the account. (Trial transcript at p. 305). Indeed, he recalled that Mr. Wagner was very upset that there was a conflict in the documents which his firm had sent to Schwab. (Trial transcript at p. 305-306). Mr. Hertzberg's recollection is that no one at Wagner Capitol Management was aware of the discrepancies among the beneficiary designations prior to Mrs. Genecin's death; indeed, if they had been aware of them, someone would have spoken to Mrs. Genecin and eliminated the ambiguity. (Trial transcript at p. 307). Mr. Hertzberg

testified that it was Mr. Wagner who drafted DX 514. At that point, both Mr. Hertzberg and Mr. Wagner were uncertain as to Mrs. Genecin's intentions, and both of them agreed that the documents could call for either a 60/40 split or a 50/50 split. (Trial transcript at pp. 308-309).

- Similarly, Ms. Sullivan testified that no one at Wagner Capital Management was aware of the contradiction in the IRA beneficiary documents at the time they were signed. (Trial Transcript at p. 250). She also testified that she told Victor Genecin shortly after Rita Genecin's death that no one understood how it came to pass that the conflicting documents were executed. (Trial Transcript at p. 251). Ms. Sullivan first learned of the discrepancy after Mrs. Genecin's death. She spoke with Mr. Wagner about it and he appeared surprised that there were conflicting IRA beneficiary designations. (Trial Transcript at p. 248).

- Just as incredible is the statement that Mr. Wagner reviewed the per stirpes document and the letter from Attorney Blumenthal (DX510) explaining that signing the per stirpes designation would result in a 50/50 distribution between the two brothers, talked with Mrs. Genecin who told him she did not want a 50/50 split, had her sign the document notwithstanding her repudiation of it, and then had her sign a conflicting document indicating a 60/40 split. (Trial transcript at p. 148).

- It is also incredible that 5½ years after the events took place, Mr. Wagner recalls that Mrs. Genecin used a different writing instrument to place the "60/40" percentages on the form, thought that it could be pencil, but concluded that it was probably acceptable because "it might be light ink." (Trial transcript at p. 99).

- Mr. Wagner's testimony about the material that was whited out on Victor Genecin Exhibit 607A also demonstrates his lack of credibility. He initially stated that it was he who whited out that material. (Trial transcript at p. 109). Indeed, he stated on two occasions that he was "certain" that he did so. (Trial transcript at p. 110). Within about a dozen questions he stated that after he returned from "going down the hall" he noticed that Mrs. Genecin had completed a part of the form that did not need to be completed and he "had her white it out." (Trial transcript at p. 112). When it was pointed out to him that he had previously testified that it was he who whited out the material, he reversed his testimony again and stated that indeed it was he who whited it out. (Trial transcript at p.112). He then changed his mind once again and stated: "I believe we whited it out together." (Trial transcript at p. 112). It is not important who whited that material out; rather, what the testimony illustrates is that Mr. Wagner cannot be believed with respect to the manner in which the various IRA documents were prepared.

- Also incredible is the claim that Mr. Wagner could recall, five and a half years after the event, the number of times Mrs. Genecin placed her initials on one of the IRA forms. (Trial transcript at p. 106). He claimed at trial that he could actually remember watching her put her initials in each of four boxes, and it was his distinct recollection that none of those boxes was left blank. Id. Mr. Wagner testified that he was as certain of that fact as he was of all of his testimony. Id. Of course, as it turns out, that document, Victor Genecin Exhibit 607A, has one blank box; clearly Mrs. Genecin had not placed her initials in each of the four boxes. (Trial transcript at pp. 106-107).

- Mr. Wagner's credibility was also undercut by his admission that he was willing to execute unauthorized trades through the device of failing to inform Schwab that Mrs. Genecin had died. (Trial transcript at p. 152). Mr. Wagner admitted that he continued to engage in unauthorized trades in Mrs. Genecin's account from the time of her death in August, 2000 until December of that year. (Trial transcript at pp. 153-54). Indeed, it appears that the only reason Mr. Wagner finally ceased his unauthorized trading was that Paul Genecin's lawyer informed Schwab of Mrs. Genecin's death. (Trial transcript at p. 154). He acknowledged that he engaged in unauthorized trading, despite knowing that he had a limited power of attorney which permitted him to make trades only on behalf of Rita Genecin, not on behalf of her estate. (Trial transcript at p. 153).

- Victor Genecin's testimony also repudiated the claim that Mrs. Genecin told Mr. Wagner that she wanted a 60/40 split. Victor Genecin testified that he spoke with Mr. Wagner in August, 2000 – within a few days of his mother's death – and at that point it was Mr. Wagner's belief that the IRA account was to be divided on a 50/50 basis. (Trial transcript at p. 270). As the court observed, when this matter came before the court on cross motions for summary judgment, Attorney Mattiaccio informed the court that there was no evidence regarding Mrs. Genecin's intention with regard to the IRA other than the IRA beneficiary designations themselves. (Trial transcript at p.130). Indeed, Mr. Mattiaccio stated: "There is no one who has any information regarding what Rita Genecin intended." (Trial Transcript at p. 130). Victor Genecin, Attorney Mattiaccio's law partner, was seated next to Attorney Mattiaccio when those statements were made. (Trial transcript at p. 132). Certainly if Mr. Wagner had previously informed Attorney Genecin that Mrs. Genecin had repudiated the per stirpes designations, that fact would have been made known in connection with the motion for summary judgment. Victor Genecin testified that he questioned Mr. Wagner shortly after he learned of the discrepancy in the IRA beneficiary designations, and asked him specifically whether he could recall any conversations with Rita Genecin that would shed light on her intentions with respect to the distribution of that account. (Trial transcript p. 411). Ultimately, and grudgingly, Victor Genecin admitted that Mr. Wagner had told him that he had no such information, and that both Mr. Wagner and Mr.

15

Blumenthal told Victor Genecin that it was their understanding that Rita Genecin wanted the account to be divided equally between the two brothers.    (Trial transcript at p. 408).

- Victor Genecin also testified that in his conversation with Mr. Wagner just days before the start of this trial, Mr. Wagner did not suggest that his mother had repudiated the 50/50 split.  (Trial Transcript at p. 426).

- Mr. Wagner's testimony regarding Mrs. Genecin's intention to split the IRA on a 60/40 basis was so unbelievable that the Court felt it necessary to caution Mr. Wagner about the penalties for perjury.  (Trial transcript at pp. 169-170).

Once Mr. Wagner's testimony on the subject is cast aside because of its unreliability, there is simply no evidence to support the plaintiff's claim that Mrs. Genecin placed the penciled-in 60/40 notation on Victor Genecin Exhibit 607A.[13]  There is also no evidence from which the Court could reach the conclusion that the document contained the 60/40 notation at the time Mrs. Genecin signed the document.

The testimony of Carol Sullivan, who witnessed Mrs. Genecin's signature on some of the IRA documents on October 8, 1998 failed to shed any light on Mrs. Genecin's intention. Ms. Sullivan testified that she did not observe who placed the penciled-in 60/40 percentages on the third page of Victor Genecin Exhibit 607A.  (Trial transcript at pp. 252-53).  This conflicts with the affidavit signed by Ms. Sullivan which was submitted by Victor Genecin in support of his motion for summary judgment.  Paragraph 4 of that affidavit refers to what has been marked in this litigation as Victor Genecin Exhibit 607A.  Ms. Sullivan's affidavit states that the handwriting on the first page of that document is hers.  The affidavit continues: "The

---

[13] Even if Mr. Wagner's testimony were to be believed, the fact is that although he initially claimed that he had observed Mrs. Genecin complete the IRA forms in their entirety, he later testified that he left the room for a period of time "to go down the hall."  (Trial transcript at p. 108).  It thus appears that he did not actually see Mrs. Genecin complete the forms in their entirety.  He stated that if he had seen Mrs. Genecin complete any portion of the IRA document in pencil, he would have stopped her and instructed her to use ink.  (Trial transcript at p. 96).

handwriting on all other pages [thus including the 60/40 designation on page 3] is that of Rita Genecin."  (DX517).  In fact, Ms. Sullivan stated during the trial that she did not observe who wrote the percentages on the third page of the document (trial transcript at p. 252-53), that someone in Victor Genecin's office had prepared the affidavit for her signature (trial transcript at p. 251), that at the time her affidavit was prepared she told Victor Genecin that she did not see who wrote the percentages on that form (trial transcript at p. 253), that she was unable to recognize Rita Genecin's handwriting (trial transcript at p. 253), and that she was always "up front" with Victor Genecin to the effect that she could not say whose handwriting appeared on the form.  (Trial transcript at p. 253).  Victor Genecin, an experienced litigator, (trial transcript at p. 377), later acknowledged that it was he who had interviewed the witnesses, including Ms. Sullivan, prepared their affidavits and sent the affidavits to the witnesses for their signatures. (Trial transcript at pp. 421-22).

While it may be that Ms. Sullivan at the time of signing the affidavit was unaware of the importance of the misstatements contained in her affidavit, no such benign motivation can be ascribed to Victor Genecin.  His conduct in preparing and filing such an affidavit is consistent with his decision to call Mr. Wagner as a witness to offer the incredible testimony mentioned above, despite having had – by Victor Genecin's own estimation – four or five prior conversations with Mr. Wagner that Mr. Wagner had absolutely no recall of conversations with Rita Genecin regarding the manner in which the IRA should be divided.  (Trial transcript at pp. 424-25).  Indeed, Victor Genecin testified that it was his belief, as well as that of Mr. Wagner and his mother's attorney, Mr. Blumenthal, that the IRA was to be split on a 50/50 basis with

his brother until October 25, 2000 when the conflicting designations came to light. (Trial transcript at p. 406).[14]

Victor Genecin was not satisfied with simply providing false statements in an affidavit and calling a witness whose testimony he knew to be untruthful; he also accused his brother in this lawsuit of causing falsified documents to be sent in order to persuade Victor Genecin to instruct Schwab to divide the IRA on a 50/50 basis. (Trial transcript at p. 429). Victor Genecin admitted that at the time of filing the Complaint - which he helped to draft (trial transcript at p. 378) – he had absolutely no evidence to support the allegation that Paul Genecin had anything to do with preparing a 50/50 document which ended up in the files of Charles Schwab. (Trial transcript at p. 433). He also acknowledged that after receiving the Schwab report with respect to the manner in which Schwab employee Karen David had created that document, Victor Genecin chose not to amend the Complaint in order to eliminate the baseless accusation against his brother. (Trial transcript at p. 434). Finally, Victor Genecin acknowledged that he did not later seek to amend the Complaint, notwithstanding the fact that he had known for quite some time prior to trial that he had no evidence to support his allegation that Paul Genecin had participated in fraudulent activity with respect to the creation of that 50/50 document. (Trial transcript at p. 434).

---

[14] Although he initially denied that Mr. Wagner had told him after his mother's death that Mr. Wagner believed that Mrs. Genecin wanted the IRA account to be divided on a 50/50 basis, he ultimately agreed that during his deposition he had provided the following testimony, which he stated was truthful: "It was Mr. Wagner's understanding or his recollection, and it was certainly Mr. Blumenthal's understanding, that the account was to be divided 50/50." (Trial transcript at p. 407). He then admitted that both Mr. Wagner and Mr. Blumenthal had told Victor Genecin after Mrs. Genecin's death that it was their understanding that Rita Genecin wanted the account to be divided on a 50/50 basis. (Trial transcript at p. 408).

Victor Genecin also did additional damage to his credibility in connection with his testimony as to his reason for not attaching DX610 to the complaint, despite the fact that he had attached other IRA documents to his complaint and despite the fact that DX610 was the beneficiary document that was transmitted most recently to Schwab. (Trial transcript at p. 390). Victor Genecin stated that he had made a conscious decision to omit DX610 because he did not think that the beneficiary designation "had any relevance to the issues in the case." (Trial transcript at p. 390). Defendant acknowledges that plaintiff was not required to attach that exhibit to the complaint, and it seems clear that the reason for not attaching it was that it would not help plaintiff's case. Had Victor Genecin acknowledged that fact, no mention of it would have been made in this brief; however, Victor Genecin's statement under oath that he decided not to attach it because he did not think it "had any relevance" further demonstrates his lack candor with the Court.

In the absence of any testimentary evidence as to Rita Genecin's intent, the Court must determine whether Victor Genecin has met his burden of proof [15] that the IRA was intended by Mrs. Genecin to be divided on a 60/40 basis by reference to the IRA documents. The only piece of evidence supporting such a conclusion is the penciled-in 60/40 notation on Victor Genecin Exhibit 607A. However, there is no credible evidence that Rita Genecin placed those figures on the document, that she was aware those figures were on the document, or that the figures were even on the document at the time she executed a different page of that document. Indeed, Ms. Sullivan specifically stated that she does not know who placed the 60/40

---

[15] As the plaintiff, it is of course Victor Genecin who bears the burden of proving his case in this matter.

designation on the document, does not know who placed the percentages on the document, or whether the percentages were placed on the document before or after Mrs. Genecin executed a different page of the same document. (Trial transcript at pp. 256-57). Under these circumstances, there is simply no reason for the Court to give any credence to Victor Genecin Exhibit 607A as any indication of Mrs. Genecin's intent.

This conclusion is buttressed by the undisputed evidence concerning the other two IRA beneficiary designations completed by Mrs. Genecin - DX509 and DX513 - both of which call for a 50/50 distribution. In contrast with Victor Genecin Exhibit 607A, there is no ambiguity about those two IRA beneficiary designations. Each of them is a single page and each is clearly signed by Rita Genecin at the bottom. One was witnessed by her lawyer, Mr. Blumenthal, and the other was witnessed by Ms. Sullivan. There can also be no dispute about what Mrs. Genecin intended by signing those documents. Her lawyer wrote a letter dated September 29, 1998 to both Mrs. Genecin and her financial advisor explaining, in plain English, that the particular beneficiary designation form enclosed in his letter "designates Victor and Paul as beneficiaries in equal shares, with provision that if either of them predeceases her, his share will go to his descendants." (DX510). The only clear indication of Mrs. Genecin's intent with respect to the IRA is contained in the two per stirpes documents.

Victor Genecin's new position with respect to the interpretation of the per stirpes IRA beneficiary designations does further damage to his credibility. Paragraph 58 of the complaint states that pursuant to the per stirpes designation, "Victor Genecin and Paul Genecin or their successors would each take 50% of the IRA." Not only is this a judicial admission, but Victor Genecin testified that as an experienced litigator, he was involved in all aspects of this

litigation.  (Trial transcript at p. 377).  He specifically stated that he was involved in drafting the Complaint and the Compliance with the Joint Trial Memorandum. (Trial transcript at pp. 378).  Despite that allegation in his own complaint and notwithstanding the fact that his mother's lawyer had clearly informed Mrs. Genecin in writing that by signing the per stirpes document she would be dividing the IRA equally between the two brothers, Victor Genecin came up with a new theory in time to include it in his compliance with the Joint Trial Memorandum.  He then passed along this theory that the per stirpes designation means that the IRA should be divided among all the descendants to Mr. Wagner who ascribed to it during his testimony.  (Trial transcript at pp. 77-78).  Contrary to this new theory, Mr. Wagner testified that when he received DX510 from Mrs. Genecin's lawyer, he understood that signing the form would result in an equal distribution between the two brothers.  (Trial transcript at p. 117).  Mr. Wagner admitted that when he wrote to the two brothers after he discovered the discrepancy in December of 2000 he believed that the per stirpes designation provided for the IRA to be divided equally between the two brothers.  (Trial transcript at p. 180).

Mr. Hertzberg also repudiated Victor Genecin's newly discovered theory about the definition of "per stirpes."  He testified that both he and Mr. Wagner believed that if the per stirpes beneficiary designation controlled, the IRA would be divided equally between the two brothers.  (Trial Transcript at p. 306).  Indeed, the letter written by Mr. Wagner, and signed by both Mr. Wagner and Mr. Herbzberg, states with reference to the per stirpes beneficiary designation: "This latter document divides the IRA equally between the two of you."  (DX 514; Trial Transcript at p. 306).

While this new theory created by Victor Genecin says nothing about Mrs. Genecin's intent when she signed the per stirpes document which had been sent to her by her lawyer with the letter of explanation, it speaks volumes about Victor Genecin's credibility in this lawsuit.

It is submitted that Victor Genecin Exhibit 607A should be discounted in its entirety. Moreover, even if there were competent evidence from which it could be concluded that Victor Genecin Exhibit 607A represented a valid designation of intent by Mrs. Genecin, then the per stirpes documents would nevertheless control. As argued in prior briefs, the IRA agreement with Schwab deals with the situation of conflicting designations by providing that it is the designation which is provided to Schwab last which controls. In this case, there is no dispute that the designation which was sent to Schwab most recently prior to Mrs. Genecin's death was DX509. (Trial transcript at pp. 197-98). That designation was prepared by Mrs. Genecin's lawyer and signed in his presence. He then transmitted it to Mrs. Genecin's financial advisor on October 19, 1998, asking that it be filed with the administrator of the IRA. (Victor Genecin Exhibit 609). There is no dispute that at that point in time Mr. Blumenthal was acting as the attorney for Mrs. Genecin. (Trial transcript at p. 222). No evidence was offered to suggest that Mr. Blumenthal was acting beyond the scope of his authority or without the consent of his client. For reasons unknown, the IRA designation then remained in the office of Mrs. Genecin's financial advisor for approximately one year. It was then sent to Schwab with a letter dated October 25, 1999, in which Mr. Hertzberg enclosed the form and stated: "Please make the appropriate changes to your records." (DX509). Mr. Hertzberg stated that when he sent Victor Genecin Exhibit 610 to Schwab, he believed that it represented Mrs. Genecin's intentions with respect to the IRA. (Trial transcript at p. 303). Mr. Wagner also testified that

when this October 6, 1998 IRA designation was sent to Schwab in October 1999, Wagner understood that it had legal effect and he believed that that form reflected Mrs. Genecin's intention with respect to the division of the IRA. (Trial transcript at pp. 224-25).

Victor Genecin testified that Victor Genecin Exhibit 610, the per stirpes IRA designation which was most recently sent to Schwab, appeared to be his mother's signature. (Trial transcript at p. 387). He also acknowledged that Attorney Blumenthal was acting as his mother's lawyer at the time. (Trial transcript at p. 387). He further conceded that Victor Genecin Exhibit 609, Attorney Blumenthal's letter dated October 19, 1998 enclosing the per stirpes IRA beneficiary designation, constitutes the last communication from Attorney Blumenthal regarding Mrs. Genecin's wishes. (Trial transcript at p. 394-96). Victor Genecin also agreed that the last instruction which Schwab received from Rita Genecin's financial advisor was the letter from Mr. Hertzberg in October, 1999, requesting that Victor Genecin Exhibit 610 (the per stirpes IRA beneficiary designation witnessed by Attorney Blumenthal) be placed in Mrs. Genecin's file. (Trial transcript at pp. 392, 397).

Thus, there are two principal reasons why the Court should conclude that Mrs. Genecin's intention was to have the IRA divided equally between her two sons. First, the only documents which purport to reflect Mrs. Genecin's intention both call for a 50/50 distribution. One of those was signed in the presence of her lawyer, and the other was signed in the presence of a staff member of her financial advisor. The only contrary document – Victor Genecin Exhibit 607A – must be disregarded in the absence of any proof from which it could be concluded that the 60/40 designation was either placed there by Mrs. Genecin or had been placed on that document with her knowledge prior to her signature. Second, even if plaintiff

23

had offered proof that Victor Genecin Exhibit 607A actually reflected Mrs. Genecin's intention at one point in time, the undisputed fact is that Victor Genecin Exhibit 610 was transmitted by her financial advisor to Schwab at a later date. Accordingly, that document controls.

The Court inquired of counsel at trial how the Court should dispose of the IRA in the event that the Court believed that the evidence was evenly divided. Inasmuch as it was Victor Genecin who initiated this action, it is he who bears the burden of proof. If he has failed in his proof, then Paul Genecin must prevail.[16] Accordingly, the per stirpes designation should control, and the Court should enter an order that the IRA is to be divided equally between Paul Genecin and Victor Genecin.[17]

## CONCLUSION

For the reasons stated above, as well as for the reasons stated in defendant's prior briefs, this Court should enter an order that the Lautrec belongs to Paul in its entirety and an order that the IRA should be divided equally between Paul Genecin and Victor Genecin.

---

[16] There is indisputable - and indeed uncontested - evidence that Mrs. Genecin did not want the IRA to pass through her estate. She took valid legal steps to remove this asset from her estate and executed the per stirpes beneficiary designations only after having been informed in writing of their meaning. The Court would be doing a very great injustice to the desires of Mrs. Genecin if it were to conclude that this asset should pass through the estate, on the theory that it could not be determined which party had prevailed. Furthermore, it would be to the advantage of neither party for the Court to conclude that the IRA is to pass under the provisions of Mrs. Genecin's will. Such a ruling would bring a non-probate asset into Mrs. Genecin's estate, thereby increasing the estate tax liability. In practical terms, this would mean that approximately 50% of the value of the IRA would go to the government; the remainder would then be available to satisfy the expenses of administration.

[17] Of course, the Court cannot order Schwab to do anything with respect to the account, since Schwab is not a party. The Court's jurisdiction is limited to entering an order declaring the rights of Paul Genecin and Victor Genecin to that account. It will then be up to Schwab to take what action it deems appropriate. In this regard, defendant's counsel has been advised that Schwab has been placed on notice that it should not disburse any funds to Victor Genecin, because of certain proceedings pending in the state of Maryland.

THE DEFENDANT,
PAUL GENECIN

By_____
    Patrick M. Noonan
    Donahue, Durham & Noonan, P.C.
    741 Boston Post Road
    Guilford, CT  06437
    (203) 458-9168

## **CERTIFICATION**

This is to certify that a copy of the foregoing was mailed, postage prepaid, on the above-written date, to:

David T. Grudberg, Esquire
David L. Belt, Esquire
Jacobs, Grudberg, Belt & Dow, P.C.
350 Orange street
P.O. Box 606
New Haven, CT  06503

Victor Genencin, Esquire
Pavia & Harcourt
600 Madison Avenue
New York, NY  10022

_____
Patrick M. Noonan