UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ESTATE OF RITA GENECIN, by | : | |
| VICTOR GENECIN, | : | |
| Personal Representative, | : | |
| Plaintiff, | : | |
| | : | CIVIL NO.3:01CV00211(MRK) |
| VS. | : | |
| | : | |
| | : | |
| PAUL GENECIN and | : | |
| VICTOR GENECIN, | : | MARCH 4, 2005 |
| in his individual capacity, | : | |
| Defendants. | : | |

**CORRECTED POST-TRIAL MEMORANDUM OF
PLAINTIFF ESTATE OF RITA GENECIN**

The Estate of Rita Genecin respectfully submits this post-trial memorandum concerning the Second Count of the Complaint, in which it seeks an Order pursuant to Section 7-102 of the Maryland Code Annotated for Estates and Trusts declaring that it is the owner of a lithograph by Henri de Toulouse-Lautrec called *Partie de campagne* (the "Lautrec").

I.    **UNDER MARYLAND LAW, A PERSON CLAIMING, AFTER THE DEATH OF A PUTATIVE DONOR, TO HAVE RECEIVED AN INTER-VIVOS GIFT, MUST ESTABLISH EVERY ELEMENT OF THE GIFT BY EXPLICIT AND CONVINCING EVIDENCE AND THE CLEAREST PROOF.**

The law of Maryland regards a claim of *inter vivos* gift, raised after the death of the putative donor, as inherently suspect.  Its courts are:

> [m]indful of the facility with which, after the alleged donor is dead, fraudulent claims of ownership may be founded on pretended gifts of his property asserted to have been made while he was living.

Schilling v. Waller, 243 Md. 271, 276, 220 A.2d 580, (Md. 1966); Schenker v. Moodhe, 175 Md. 193, 197, 200 A. 727, 728 (Md. 1938).  They therefore require a putative donee to establish every element of an alleged gift by "'explicit and convincing' evidence and the 'clearest proof.'" Rogers v. Rogers, 271 Md. 603, 607, 319 A.2d 119, 121 (Md. 1974); Schilling, 243 Md. at 276, 220 A.2d at 583.  To prevent "self-interested perjury," moreover, Maryland's Dead Man's Statute forbids testimony by a party in a proceeding by or against an estate about facts that could be disputed only by the decedent.  Farah v. Stout, 112 Md.App. 106, 114, 684 A.2d 471, 475 (Md. App. 1996).

It is in this legal context that Paul Genecin ("Paul") presents his claim that Rita Genecin made a gift to him of the Lautrec, the most valuable work of art she owned, by giving him DX 501. DX 501 appears to be a "Deed of Gift" from Rita Genecin to Paul, that was "sworn to" before a notary in New Haven on January 4, 2000.  Subsequent to Rita Genecin's death, Paul Genecin repeatedly vouched for this date, which appears at the top of the document and on the notary's attestation.  (PX 24, Tr. 761-3; PX 25; Tr. 766).  He has now admitted, however, that Rita Genecin was not in New Haven on January 4, 2000, did not sign DX 501 on that date, and did not sign DX

501 in the notary's presence. (Tr.762-3). Nonetheless, he urges this Court to overlook these falsifications and find that DX 501 is a genuine statement by Rita Genecin and sufficient to effectuate an inter vivos gift based solely upon his testimony, which is barred by the Dead Man's Statute, and despite the fact that the Lautrec never left the physical possession of Rita Genecin during her lifetime.

## II.    PAUL GENECIN HAS FAILED TO PRESENT THE 'CLEAREST PROOF' OF EACH ELEMENT NECESSARY TO ESTABLISH AN INTER-VIVOS GIFT UNDER MARYLAND LAW.

According to Paul, Rita Genecin gave him the Lautrec as a Christmas gift by executing DX 501 in December, 1999. (Tr. 624-5; 634). Paul himself is the only witness who claims that he was present when the gift was given. However, his testimony is precluded by the Maryland Dead Man's Statute. Paul's son Gregory Genecin ("Gregory") testified that he was at Rita Genecin's home during Christmas, 1999. He could not recall anyone mentioning a gift of the Lautrec during that visit. (Tr. 525). Paul asserts that his wife was present when Rita Genecin gave him the gift. (Tr. 800-1). However, she did not testify.

The uncontradicted evidence is that Rita Genecin never parted with physical possession of the Lautrec during her lifetime and at no time during her lifetime did Paul have physical possession of the Lautrec. Under Maryland law, delivery of physical possession of portable personal property is necessary to effectuate an inter-vivos gift. Constructive delivery of personal property cannot be established by proof of delivery of a deed of gift. Here, moreover, Paul Genecin cannot meet his burden of showing, by "clearest proof," both the genuiness of the deed of gift and the fact of delivery of it to him during the alleged donor's lifetime.

### A.    Paul Genecin Has Not Established Actual Delivery of the Lautrec.

The validity of an alleged gift under Maryland law depends upon the legal sufficiency of the delivery. Schenker v. Moodhe, 175 Md. 193, 197, 200 A. 727, 730 (Md. 1938); Hamilton v. Caplan, 69 Md. App. 566, 573, 518 A.2d 1087, 1090 (Md.App.1986). The property that is the subject of the

2

gift must be placed "wholly under the donee's power."  Dulany v. Taylor, 105 Md.App. 619, 632

660 A.2d 1046, 1053 (Md.Ct.Sp.App. 1995); Hamilton, 69 Md. App. at 573, 518 A.2d at 1090.

Indeed, it is essential to the validity of an *inter vivos* gift "that the transfer of both possession and

title shall be absolute and shall go into immediate effect."  Berman, 193 Md. 177, 182, 66 A.2d 392,

393 (Md. 1949).  Paul's case is utterly lacking in proof of delivery.

**1.    Paul Genecin did not take physical possession of the Lautrec.**

Paul Genecin did not remove the Lautrec from Rita Genecin's home at the end of his

Christmas, 1999 visit (Tr. 638); nor did he remove it during his two subsequent automobile trips to

Baltimore.  (Tr. 646, 699-700, 701, 710).  Rita Genecin was clearly able to effectuate physical

delivery of lithographs to Paul.  Paul testified that she transferred physical possession to him of a

number of valuable works of art between 1998 and 2000, namely the four items that are the subjects

of DX 503-506.

In fact, the evidence, including Paul's own contemporaneous written communication, clearly

shows that Rita Genecin never intended to relinquish possession of the Lautrec.  Paul's

acknowledgment of Rita Genecin's intent not to relinquish the Lautrec is fatal to his claim:  the

element of delivery can be established only by the clearest proof of transfer of "the donor's

dominion over the property without power of revocation or retention of dominion over the subject of

the gift." Dorsey v. Dorsey, 302 Md. 312, 318, 487 A.2d 1181, 1184 (Md. 1985).

On October 10, 2000, Paul wrote that Rita Genecin had explained to him in July, 2000, "*a*

*propos* of the Lautrec," that she transferred her house to joint ownership by Paul, Victor and herself

"to permit her to live with the works of art after she had given them away."  (PX 25).  Paul testified

that Rita Genecin told him that Mr. Wagner was the source of her strategy of changing the

ownership of the house.  (Tr. 690).  He thus corroborates Mr. Wagner, who testified that he arranged

for this change in connection with the creation of PX 5–8, as one of a number of actions that might

show that donees had assumed dominion and control over gifts of personal property that remained in

3

the house.  (Tr. 62-4).  Mr. Wagner advised Rita Genecin that she should also place labels, with

dates, concerning gifts, on the backs of her works of art, and change her insurance to reflect

ownership by the donees. (WAGNER: Tr. 64; HERTZBERG: Tr. 282).  Mr. Wagner further testified

that he explained to Rita Genecin that there was "no guarantee" that these actions would result in a

"perfected gift" of the shares of the Lautrec,

> because of [her] intent to want to sort of keep control of it a little bit i.e., part
> ownership, or have it in [her] home, although owned by other people along with
> [her].

(Tr. 64).  Indeed, Messrs. Wagner and Hertzberg wrote on September 12, 2000:

> Rita told us that she intended to periodically gift pieces of the artwork to her
> children and, at the same time, keep the artwork in her home.

(DX 502).  Rita Genecin's expressed desire to retain possession of the Lautrec obviates any showing

that she intended, at Christmas, 1999, to effectuate an immediate and irrevocable transfer to Paul of

both title and possession.

### 2.    Paul Genecin's explanations for his failures to take possession of the Lautrec on his trips to Baltimore are barred by the Dead Man's Statute.

The test to determine whether there has been a "transaction" within the meaning of the

statute is "[w]hether, in case the witness testify falsely, the deceased, if living, could contradict it of

his own knowledge." Schifanelli v. Wallace, 271 Md. 177, 184, 315 A.2d 513 (Md. 1974); Boyd v.

Bowen, 145 Md.App. 635, 662-3, 806 A.2d 314, 329-30 (Md. Ct. Sp. App. 2002).  If Rita Genecin

were alive to testify, she could contradict Paul's assertion that he did not take the Lautrec because,

on each occasion, it was not convenient for him to transport the print. (Tr. 701).  The theoretical

possibility that the decedent could contradict the putative donee is sufficient to invoke the strictures

of the statute; in this case there is also reason to believe that Rita Genecin would, in fact, contradict

Paul.  Paul has admitted that, in late July, 2000, Rita Genecin was expressing her intent to keep the

4

Lautrec in her possession.  (PX 25).  In the face of that intent, Paul could not remove the Lautrec from Baltimore, and it made no difference how his car was laden.

Paul's testimony moreover, entirely undercuts any theory of delivery:  he asserts that he "postponed bringing [the Lautrec] back," (Tr. 642), and that he had conversations with Rita Genecin in which they discussed the fact that the Lautrec was in Rita Genecin's house "temporarily," (Tr. 634), or agreed that he would "take it next time."  (Tr. 646).  Indeed, he claims that his mother wanted him to take physical possession of the Lautrec but it was not practical for him to take it back to New Haven. (Tr. 701).  If this testimony were admissible and credible, then this case would be on all fours with Schenker, 175 Md. at 197, 200 A. at 730, in which the Court of Appeals of Maryland held that no valid gift was shown where the putative donee testified that the decedent told her to remove the property in question, but she did not do so.

> **3.      Neither the testimony of Gregory Genecin nor that of Matilda Sherlock establish that Rita Genecin made a completed gift Of the Lautrec.**

Neither the testimony of Paul Genecin's son, Gregory, nor that of Matilda Sherlock, that Rita Genecin told each of them, in the spring of 2000, that she had given the Lautrec to Paul at Christmas, 1999 establishes that a completed gift had been made.

First, neither witness provides testimony to establish the necessary element of physical delivery of the Lautrec, and neither witness gives any support or corroboration to Paul's "deed of gift."

Second, the testimony of these informal conversations with Rita Genecin, purportedly recalled from events more than four years earlier, are consistent with a promise to transfer the Lautrec to Paul at some future date.  Such a promise does not qualify as a gift under Maryland law. Berman 193 Md. at 182, 66 A.2d at 393.

Third, these two witnesses, moreover, brought their information to Paul's attention just prior to trial, (SHERLOCK:  Tr. 497; GREGORY:  Tr. 527), although both were aware of this lawsuit

long before. (SHERLOCK: Tr. 504; GREGORY: Tr. 532-3). Gregory testified that he was at Rita Genecin's house in December, 1999, but had no memory of anyone in the family mentioning a gift of the Lautrec during that visit or shortly thereafter. (Tr. 525). Gregory knew, moreover, that his father and uncle were involved in this lawsuit, (Tr. 532-533), and that the Lautrec, which his father had brought home after his grandmother's death, had been removed from his house, (Tr. 534-5), but never mentioned, nor was asked about, his knowledge concerning the Lautrec until the eve of trial. (Tr. 527). Mrs. Sherlock, for her part, testified that Rita Genecin had placed "initials" on the back of the Lautrec to indicate that it belonged to Paul, but then admitted that she had no actual knowledge of this, and, indeed, no recollection that Rita Genecin even told her that she had placed initials on the backing of the Lautrec. (Tr. 500-02). Paul testified that he did not place any label or writing on the back of the Lautrec to show that he owned it, nor did Rita Genecin do so. (Tr. 678-80). Indeed, no one wrote Paul's name or initials on the backing of any of Rita Genecin's lithographs. (Tr. 680).

Fourth, the testimony is as consistent with her having made gifts of fractional shares of the Lautrec to Paul and other members of his family.

Finally, this testimony is inadmissible hearsay. *See, generally*, Farah, 112 Md.App. at 119-21, 684 A.2d at 477-8. The declarations attributed to Rita Genecin are statements of memory or belief, offered to prove the fact remembered, and present the classic hearsay dangers of memory and narration. Fed. R. Evid. 802; 803(3); Shepard v. United States, 290 U.S. 96, 106, 54 S.Ct. 22, 26, 78 L.Ed. 196 (1933); United States v. Murray, 297 F.2d 812, 816 (2d. Cir. 1962); Oberman v. Dun & Bradstreet, Inc., 507 F.2d 349, 352 (7th Cir. 1974); Firemen's Fund Ins. Co. v. Thien, 63 F.3d 754, 760 (8th Cir. 1995); National Society of the Daughters of the American Revolution v. Goodman, 128 Md. App. 232, 238, 736 A.2d 1205, 1209 (Md. Ct. Sp. App. 1999).

In addition, Paul's failure to call his wife as a witness, although he claims that she was present when Rita Genecin gave him the Lautrec, (Tr. 800-1), and that he gave his wife DX 501 to file, but that she did read it or recall that she had done so, (Tr. 754-55), raises the inference that her

6

testimony would be unfavorable to him.  Revson v. Cinque & Cinque, P.C., 221 F.3d 71, 81-2 (2d Cir. 2000).  See also Steiner v. Comm'r of Internal Revenue, 350 F.2d 217, 222-3 (7th Cir. 1965)(where taxpayer testified that he told his wife about a gift, Tax Court properly drew adverse inference from his failure to call her as a witness).

**B.    Paul Genecin Has Not Established Constructive Delivery of the Lautrec.**

Paul Genecin cannot claim that Rita Genecin actually delivered the Lautrec to him.  Nor can he establish that the Lautrec was constructively delivered to him for four reasons: (1) Maryland law does not recognize that a gift of portable personal property can be made by delivery of a writing; (2) he cannot show by the 'clearest proof' that the writing in question, DX 501, is genuine; (3) he has failed to establish that DX 501 was delivered to him during Rita Genecin's lifetime; and (4) the circumstances of the making of the January 12, 2000 deed of Rita Genecin's house to herself and her two sons negates any claim of constructive delivery.

**1.    Maryland law does not recognize the concept of delivery of portable personal property by delivery of a writing.**

Under Maryland law, transfer of possession and transfer of title are separate elements of an *inter vivos* gift, and the putative donee must present the "clearest proof" of each of them.  Dulany, 105 Md. App. at 631, 660 A.2d at 1053; Rudo v. Karp, 80 Md. App. 424, 429, 564 A.2d 100, 102-3 (Md. Ct. Sp. App. 1989).  The Maryland courts have never held that delivery of a deed can substitute for physical delivery of portable personal property.[1]  To the contrary, they view the requirement of transfer of physical possession as "the only substantial protection," and refuse to "weaken it by

---

[1] In Smith v. Acorn, 32 A.2d 252 (D.C. Mun. Ct. App. 1943), the District of Columbia Municipal Court of Appeals held that a gift of an automobile by delivery, before a third-party witness, of a duly-witnessed assignment of title, executed on the certificate of title, was valid under Maryland law.  No Maryland court has ever cited this case or adopted a similar holding.  The case, moreover, is distinguishable:  as the court noted, the certificate of title is the document required by law to evidence ownership, and, after assigning title, the donor could not sell or transfer the car without producing the certificate.  32 A.2d at 255-6.

permitting the substitution of convenient and easily proven devices." <u>Schenker</u>, 175 Md. at 197, 200 A. at 730.

**2.    Paul Genecin cannot establish by the 'clearest proof' that the purported deed of gift is genuine.**

Numerous pieces of evidence preclude a finding that the purported deed of gift by which Paul Genecin claims ownership of the Lautrec is genuine.

**a.    Paul Genecin made no mention of the purported deed of gift until September 2000 and then repeatedly vouched for a document he knew was falsely notarized.**

According to Paul's testimony, the gift of the Lautrec was consummated by Rita Genecin's signing of DX 501, which Paul testified he witnessed during his visit in Baltimore. (Tr. 613; 622-3; 624-5; 777). In his sworn answers to interrogatories, however, Paul swore that:

> Rita Genecin asked Paul Genecin to prepare a deed of gift with respect to the Lautrec. Paul Genecin typed the deed of gift and sent it to Rita Genecin. Rita Genecin signed it and returned it to Paul Genecin, asking that he have it notarized. Phyllis Mulrine [a subordinate of Paul's] then affixed the notary seal to the document.

(PX 30, ¶1). In his earlier sworn version, Paul swore that he had not witnessed Rita Genecin's execution of DX 501. However, on cross-examination at trial, Paul repudiated his sworn interrogatory answer:

> My answer to this isn't accurate. We went to visit her and I had the letters with me.

(Tr. 778). In a case in which his burden is to present the "clearest proof," Paul has sworn to contradictory versions of the event that is central to his claim.

In addition to his contradictory sworn statements concerning the creation of DX 501, in contemporaneous statements, Paul Genecin vouched for the authenticity of DX 501, which he knew was falsely notarized. Indeed, Paul gave no hint of his claim to 100 percent of the Lautrec until after Rita Genecin's death and nearly a month after he had gained possession of it by promising his brother that he would safeguard it for their mother's estate, and after becoming aware of the

8

documents purporting to give him only a 1/15th interest in the Lautrec and after becoming aware of the terms of his mother's will providing that he was to receive only 45 percent of her residuary estate. (PX 10; TR. 761-2). Only on September 5, 2000, did he fax DX 501 to Max E. Blumenthal, Esq., the estate's administration counsel, (Tr. 755-6, 761), with a cover note in which he referred to DX 501 as "this letter from last January." (PX 24). At trial, Paul admitted that he wrote these words knowing that Rita Genecin had not signed DX 501 on January 4, 2000, that she had not signed it in New Haven, and that she had not signed it before the notary. (Tr. 761-3). He further admitted that he never told Attorney Blumenthal the truth about the execution of the document, (Tr. 762), and conceded that his cover note and the appearance of DX 501 made it reasonable for Attorney Blumenthal to draw the false conclusion that Rita Genecin's execution of DX 501 had been witnessed by a notary in New Haven on January 4, 2000. (Tr. 763).

In his first letter to Victor about his claim, on October 10, 2000, Paul wrote:

> I feel that the Lautrec is not in the Estate, although I cannot explain why
> Mother wrote four letters [PX 5 - 8] gifting four fifteenths to my family two
> days after gifting it to me in its entirety.

(PX 25). PX 5-8 are all dated January 6, 2000,[2] two days after January 4, 2000, the date that appears on DX 501. Paul admitted at trial that he intended his assertion that PX 5-8 were written "two days after" Rita Genecin had gifted the Lautrec "in its entirety," to be a reference to DX 501, even though he knew, when he sent PX 25 to his brother, that Rita Genecin had not signed DX 501 in New Haven, before the notary, on January 4, 2000. (Tr. 766). Knowing, on October 10, 2000, that Victor was personal representative of Rita Genecin's estate, Paul wrote to him to claim that the Lautrec should not be included in that estate, (Tr. 767-8), and vouched for the authenticity of the false date and notarization of his "gift letter" to convince his brother that the Lautrec had been given to him.

This Court is not required to reach the issue of Paul's motive. The Estate has no burden under Maryland law. It may be that Paul decided to appropriate the Lautrec in order to "even the

---

[2] They were subsequently executed before a notary in Baltimore on January 12, 2000.

score," when he learned, after Rita Genecin died, that in her Will, (PX 10), she directed unequal distribution between Paul and Victor, with 55% to go to Victor, and 45% to Paul.  (Tr. 794-5).  Whatever his motive, Paul must prove the gift that he alleges by explicit and convincing evidence and the clearest proof.   The questions raised by his conduct and testimony make it impossible for him to meet his burden.

> **b.    The admitted falsehoods concerning the notarization of DX 501 cast doubt on its authenticity.**

Paul testified that he and Rita Genecin decided together to place the date of January 4, 2000 at the top of DX 501 because Paul would be at work that day and could have Ms. Mulrine notarize it. (Tr. 611, 614).  This claim is predicated upon Ms. Mulrine's assertion that it is her usual practice to date her notarization on the actual date on which she notarizes a document.  (Tr. 455; 460; 465).  She could not, however, testify that she had a specific memory of dating DX 501 (Tr. 460, 470, 487) and she admitted that it was also her "usual practice" not to notarize a document that was not signed and sworn to before her, a practice she admittedly violated.  (Tr. 472).  The numerous and admitted falsehoods contained within Ms. Mulrine's notarization of DX 501, eliminate all grounds for believing that she notarized DX 501 on January 4, 2000.  Ms. Mulrine admitted that her notarial attestation that the document was "Subscribed ... before [her], a Notary Public" was false.  (Tr. 478-9). She admitted that her notarial attestation that DX 501 was "Sworn to before [her], a Notary Public" was false. *Id.*  She admitted that DX 501 was neither subscribed nor sworn to before her on "this 4th day of January, 2000." *Id.*  The only apparently true statement in the attestation that Ms. Mulrine placed on DX 501 is that she was a "Notary Public in and for the County of New Haven and State of Connecticut," the public trust that Paul got her to betray.  Ms. Mulrine testified that she had been a notary for "a good many years," (Tr. 448) and that Paul was the only person who ever asked her to attest documents in the absence of the putative maker. (Tr. 472; 478).

Moreover, Ms. Mulrine's testimony establishes that she must have placed a false date on at least one of the 'deeds of gift' (DX 501, 503-507) she notarized for Paul Genecin.  To corroborate

his claim that Rita Genecin was involved in his scheme, Paul sought to have Ms. Mulrine testify that she pointed out to Rita Genecin that DX 504 is headed "December 25, 1997," but that she was notarizing it on May 6, 1998.  Ms. Mulrine, however, could not remember whether DX 504, DX 505 and DX 506, all apparently notarized May 6, 1998, were signed in her presence, nor whether she noticed the disparity in the dates on DX 504 when she notarized it.  (Tr. 460-463).  She was confident that Rita Genecin executed documents in her presence on just one occasion.  (Tr. 460; 470; 473-4; 486).  She was equally certain that there was just one occasion when she notarized a document or documents, purportedly signed by Rita Genecin, when Rita Genecin was not present.  (Tr. 451; 466-7; 485).  There were, thus, just two occasions on which Ms. Mulrine notarized documents signed by, or purportedly signed by, Rita Genecin, but Ms. Mulrine's notarizations in evidence bear *three* different dates:  May 6, 1998 (DX 504-506); January 4, 1999 (DX 503); and January 4, 2000.  (DX 501 & 507).  She must, therefore, have placed a false date on at least one of her notarizations.  Ms. Mulrine, moreover, could not identify any of Paul's "gift letters," (DX 501, DX 503-507), as a document that Rita Genecin executed in Ms. Mulrine's presence. (Tr. 460; 470; 487).  In light of this testimony, the Court cannot conclude that the notarization date on DX 501 was actually the date on which it was falsely stamped by Ms. Mulrine.

In his deposition, moreover, Paul asserted categorically that Rita Genecin never signed any document in Ms. Mulrine's presence, and that Ms. Mulrine had no basis for recognizing Rita Genecin's signature other than his representation that the signature was his mother's.  (Tr. 782-3; PX 17 at 84).  At trial, he testified that he had been "mistaken" at his deposition.  (Tr. 782).  Ms. Mulrine's lack of recollection of *any* document that Rita Genecin executed in her presence (Tr. 460, 470, 487), the contradictions in Paul's sworn testimony, and the false dating issue all point to the conclusion that no aspect of Paul's "gift letters," or of his testimony about them, can be trusted.

### c. The misdescription of the Lautrec in PX 501 evidences its lack of authenticity.

DX 501 describes the Lautrec as:

One *signed* lithograph by Henri de Toulouse-Lautrec, entitled La Chariot Anglais.

However, the Lautrec is *not* signed.  (VICTOR:  Tr.  374; PAUL:  Tr. 672).  Paul's inadmissible testimony, (Tr. 611-12, 614, 624, 655), is the only evidence for the source of the text of DX 501.  Rita Genecin's knowledge of art, (Tr. 518; 561-3), and the fact that she had owned another lithograph that was signed by Lautrec, not just stamped, (PX 22; Tr. 672), argue strongly that she had nothing to do with DX 501.

The description of the Lautrec in PX 5-8 casts further doubt upon the authenticity of the falsely-notarized DX 501.  In PX 5-8, the Lautrec is described as follows:

> Henri de Toulouse-Lautrec, French (1864-1901)
> Partie de campagne, color lithograph, 1897.  Delteil 219,
> Adhémar 322, Adriani 228, Wittrock 228.  Numbered 20
> from the edition of 100.  With Lautrec's orange-red
> monogram stamp (Lugt 1338).  A fine impression in
> fine condition.  Framed.

This description was copied by Mr. Hertzberg from PX 22.  (Tr. 280).  The information provided includes the fact that this lithograph is number 20 from the edition of 100, the condition of the print, and references to catalogs of the artist's work in which it is listed. (Tr. 374; 665).  An identical description appears in Rita Genecin's insurance policy.  (PX 29).  When Rita Genecin took steps affecting her Lautrec, she took care to provide a full and accurate description of it.

The title of the Lautrec, moreover, is shown on PX 5-8, on PX 22 (the appraisal), on PX 11 (the insurance rider that Paul obtained when he insured the Lautrec as the Estate's property), and on PX 27 (Rita Genecin's annotated list of art works) as *Partie de campagne*.  Although it is sometimes referred to as *Partie de campagne/La Charette anglaise*, it is not known as "La Chariot Anglais," and Paul admitted that no other document in the case refers to the print by the title shown on DX 501.(Tr. 670).  Moreover, the undeniably genuine deed of gift to Victor concerning the two Vuillards, dated January 8, 2000 (DX 516, Ex. E), contains technically accurate descriptions of the works of art involved.

        **d.**      **PX 27, Rita Genecin's annotated inventory of her art collection, does not reflect Paul's claimed gift of the Lautrec.**

Paul's claim that Rita Genecin gave him the Lautrec at Christmas, 1999 is further refuted by PX 27,[3] a typewritten list of works of art owned by Rita Genecin, annotated in her handwriting, (Tr. 728), but bearing no annotation concerning the Lautrec, which appears as the first item on the list. (Tr. 733; 737-8).  Next to the third typewritten item, "Munch lithograph; Das Wieb," Rita Genecin wrote, "Gift to Paul-1999."  (Tr. 733).  This work is the subject of DX 503, dated January 4, 1999, but Paul testified that he took physical possession of it "sometime in the second half of 1998." (Tr. 748).

Item 4 on PX 27 is "Johns litho; Numbers (1967)."  The name "Paul," in Rita Genecin's handwriting, appears beside this item.  Item 6 is "Johns litho; Two Flags (1970 - 72)."  Rita Genecin wrote "Paul" next to this item.  Item 8 on PX 27 is "Pearlstein litho; Girl on Orange and Black Mexican Rug (1973)."  Next to this item, Rita Genecin wrote Paul's name.  "Numbers" is the subject of DX 504; "Two Flags" is the subject of DX 505; the Pearlstein lithograph is the subject of DX 506. Paul testified that Rita Genecin physically transferred all three of these lithographs to him.  (Tr. 617).

Most significantly, item 20 on PX 27 is "Munakata woodcut print; The Hawk Woman."  Rita Genecin wrote the name "Paul" next to this item.  This print is the subject of DX 507, dated January 4, 2000 (Tr. 735), the same date as DX 501 concerning the Lautrec.  Paul testified that he had "The Hawk Woman" in his possession starting in 1978; (Tr. 622; 738); however, he only added it to his homeowner's insurance in January, 2000.  (Tr. 745-6).

PX 27 bears an annotation, in Rita Genecin's handwriting, confirming her gift to Paul of each work of art that was:  1) the subject of a "gift letter;" *and,* 2) in Paul's physical possession prior to Rita Genecin's death.  The *only* work of art for which Paul has put forward a "gift letter" that has no

---

[3] This document is page 44 of PX 26.  Originally offered as PX 26A (Tr. 728), it was designated PX 27 by the Court (Tr. 733).

confirming annotation on PX 27 is the Lautrec, which was not in his physical possession when Rita Genecin died.

Also significant is Paul's testimony that Rita Genecin told him at Christmas, 1999, when he claims to have been given the Lautrec, that she had given or was planning to give the two Vuillards listed at items 10 and 11 of PX 27 to Victor. (Tr. 631; 736-9). Next to each of these items, Rita Genecin wrote the name "Victor." (Tr. 737). It was during that very same visit that Paul claims Rita Genecin signed DX 501, making a gift of 100 percent of the Lautrec to him, (Tr. 624-5), and DX 507, making a gift to him of the Munakata. (Tr. 622-3; 737-8). This narrative, the letter to Victor concerning the Vuillards (Exhibit E to DX 516) and the fact that Paul added the Munakata to his homeowner's insurance in January, 2000, (Tr. 745-6), all support the inference that PX 27 was annotated by Rita Genecin at or about the time when Paul claims that she made a gift to him of the Lautrec. Yet, PX 27 bears no indication that the Lautrec was a gift to Paul, casting strong doubt on his claim.

> **e.    The fractional gift documents (PX 5-8) demonstrate that DX 501 is not genuine.**

Rita Genecin's documented conduct during the first two weeks of January, 2000 is inconsistent with any involvement by her in Paul's scheme to procure a false notarization on DX 501. On January 6, 2000, two days after the false date on DX 501, Rita Genecin met with her financial advisers. (Tr. 67, 279). She expressed the wish to make "gifts" of art works for estate-planning purposes, while retaining possession of them, (Tr. 64), and she provided a professional appraisal of her art collection, (PX 22), so that Mr. Hertzberg could prepare deeds for fractional shares of the Lautrec. Mr. Hertzberg prepared PX 5-8 the same day, (Tr. 280), and asked a lawyer to prepare a deed for Rita Genecin to convey her house from herself to herself and Victor and Paul as joint tenants. (Tr. 283).

Six days later, on January 12, 2000, Rita Genecin returned to her advisers' office to execute PX 5-8; PX 9, the deed changing ownership of her home; PX 10, the First Codicil to her Will

(naming her sons and Mr. Wagner as co-Personal Representatives of her Estate); and a letter in which she purported to make gifts to Victor of two Vuillard lithographs. (Exh. E to DX 516). These documents were duly acknowledged by Rita Genecin before Carol N. Sullivan, a notary public of the State of Maryland.  (Tr. 243).

PX 5–8 are an unambiguous expression of Rita Genecin's intent to transfer fractional shares of the Lautrec to Paul, his wife and his sons, while reserving title to eleven-fifteenths of the print to herself.  Rita Genecin clearly believed, in early January, 2000, that the Lautrec was hers to dispose of as she wished.  She wished to give Paul a 1/15th share, not title to 100 percent of the lithograph. Paul conceded on October 10, 2000 that PX 5-8 cannot be reconciled with his assertion of ownership of 100 percent of the Lautrec.  (PX 25:  "I cannot explain why Mother wrote four letters gifting four fifteenths to my family two days after gifting [the Lautrec] to me in its entirety.")  At trial, he still had no explanation.  (Tr. 688).  Indeed, to fit these facts one must choose between two theories, either of which is fatal to Paul's claim:  either his narrative of the events of Christmas, 1999 is a fabrication, or Rita Genecin did not believe, in January, 2000, that she had irrevocably transferred title and possession to Paul. The preparation and execution of PX 5–8 are attested by disinterested third-party witnesses.  (SULLIVAN: Tr. 243; HERTZBERG: Tr. 282).

### f.     Other than DX 501, Paul Genecin identified no other occasion on which Rita Genecin gave him a "gift letter" before she had physically delivered the work of art named in it.

Paul Genecin claimed that the Lautrec "was given to me at Christmas in the same way that my mother had given me ever so many pictures." (Tr. 677).  However, he failed to identify a single instance, in which his mother gave him a "gift letter" *before* she physically delivered the work of art named in it.  He did testify that Rita Genecin "made gifts" without any deeds of gift on many occasions.  (Tr. 568).  He also testified that the "gift letters" for the Munch (DX 503) and the Munakata (DX 507) were given to him long *after* his mother gave him physical possession of the prints.  (Tr. 622, 734, 748).

In addition, Paul's own testimony establishes that the "gift letters" concerning two prints by Jasper Johns (DX 504 and DX 505) referred to lithographs that had already been physically transferred to him while the "gift letter" concerning the lithograph by Philip Pearlstein (DX 506) refers to a print Rita Genecin "was giving" to him on that date. On May 28, 2004, he testified that he recalled an occasion when he prepared "gift letters" with Rita Genecin in his office in New Haven concerning "a group of pictures, some of which she had already given me, and one or two of which she was giving me," although he did not "remember which pictures specifically." (Tr. 571-3). However, on November 22, 2004, he testified that he recalled that DX 504 and DX 506 was signed by Rita Genecin in Ms. Mulrine's presence on May 6, 1998 (Tr. 781) and admitted that DX 504 and DX 505 were backdated at the time of their creation. (Tr. 772-3). This testimony, if believed, would compel a conclusion that DX 504 and DX 505 had previously been physically transferred while DX 506, dated May 6, 1998, referred to a print Rita Genecin "was giving" him on that date. Thus, even on the view most favorable to Paul Genecin of his inadmissible testimony, DX 501 is the only "gift letter" that he claims was given to him while Rita Genecin retained possession of the print.

> **g.    A gift of the $150,000 Lautrec to Paul would have had negative gift tax consequences for Rita Genecin of which she was aware.**

Rita Genecin's financial advisers testified that PX 5-8 were created and executed because she wished to distribute the Lautrec in a way that would remain within the limitations of the annual exclusion from gift tax. (WAGNER: Tr. 62-3; HERTZBERG: 281-2). Paul corroborated this testimony, acknowledging that Rita Genecin understood the tax implications of a gift of the totality of the Lautrec, and that giving 1/15th shares of the Lautrec to Paul and his immediate family would have been a gift without tax consequences. (Tr. 768-70). In the face of this evidence, Paul would also need explicit and convincing evidence, which he lacks, that Rita Genecin specifically elected to incur instead the tax exposure inherent in making a gift of 100 percent of the Lautrec.

The financial advisers also testified to discussions of gifts of art with Rita Genecin starting in the autumn of 1999 (WAGNER: Tr. 67; HERTZBERG: Tr. 278). To the end of her life, however,

she never told them about any gift of the Lautrec other than the one embodied in PX 5-8. (WAGNER: Tr. 68, 160; HERTZBERG: Tr. 279, 282-4.)  They only learned of DX 501 in September, 2000.  (DX 502), (WAGNER: Tr. 198-9; 200; HERTZBERG: 317-19).  Among the documents Mr. Hertzberg prepared after the January 6, 2000 meeting, and that Rita Genecin executed on January 12, 2000, was the First Codicil to her Will, naming Mr. Wagner to be a personal representative of her estate.  (PX 10, Tr. 68, 283).  Clearly, Rita Genecin had confidence in Mr. Wagner.  Paul's case, therefore, depends upon the claim that Rita Genecin kept the "gift" of 100 percent of the Lautrec secret from her advisers.

**h.     Paul Genecin did not act in a way consistent with a belief
that the Lautrec had been given to him.**

Paul must convince the Court by "the clearest proof" that Rita Genecin gave him the Lautrec as a Christmas present in 1999.  However, his conduct prior to September 5, 2000, (PX 24), was totally inconsistent with a belief on his part that the Lautrec had been given to him.  He claims that Rita Genecin told him, before that Christmas visit, that she was going to give him the Lautrec, which he "particularly loved," (Tr. 623), when he came to Baltimore, (Tr. 624-5, 634), but he took his dog with him, making it inadvisable to transport the Lautrec. (Tr. 638, 647).  He testified that he expected and intended to remove the Lautrec when he went to Baltimore in late July, 2000, (Tr. 646; 701-2), but came home with tools, pots and glassware instead. (Tr. 646).  He knew of art movers, but never arranged to ship "his" Lautrec.  (Tr. 700).

Paul had an insurance policy for his valuable prints, (Tr. 649), but did not add the Lautrec to this coverage prior to Rita Genecin's death. (Tr. 714, 745-6).   Indeed, he insured the Munakata, but not the Lautrec, in January, 2000, although he claims that he received "gift letters" for both prints in December, 1999.  (Tr. 745-6; DX 501, 507).   He testified, moreover, that he had "no specific knowledge" whether Rita Genecin insured the Lautrec up to the time of her death.  (Tr. 713).  This lack of concern for protecting the value of the Lautrec is inconsistent with the belief that he was its owner.

17

Paul testified further that he did not place a label or other writing on the back of the Lautrec to show that ownership had changed, nor did Rita Genecin do so.  (Tr. 678-80).  He did not tell his brother Victor that their mother had made a gift to him of the Lautrec.  (Tr. 376).  Notably, he did not even send his mother a letter of thanks for this generous "gift."  (Tr. 675-6).  He sought to explain this failure by testifying that he "seldom had any occasion to send her a letter," (Tr. 675-6), apparently forgetting his earlier testimony that Ms. Mulrine had falsely notarized two originals of DX 501, and that he sent one to Rita Genecin for her file.  (Tr. 625).  In other words, he claims that he had occasion to send a letter to his mother in connection with this very transaction, but did not acknowledge the purported gift of the Lautrec.

In the week following Rita Genecin's death, moreover, Paul did not breathe a syllable about the "gift" of the Lautrec.  (VICTOR:  Tr. 376; PAUL:  682-6; 714).  He did, however, agree that Victor should serve as sole personal representative of their mother's estate, knowing that Victor had seen PX 5-8.  (PAUL:  Tr. 757, PX 24; VICTOR: Tr. 369; WAGNER: Tr. 77).  He then secured Victor's consent to take the Lautrec to his house for safekeeping, and discussed with Victor the need to insure the Estate's works of art.  (VICTOR: Tr. 370-2; PAUL: Tr. 685).  If Paul believed that the Lautrec was his, he surely would have raised the issue in this discussion.  Instead, as Paul testified, he contacted his insurance agent:

> The agent on the phone said, well, what do you want to call this?  Do you want this to be your insurance?  And I said, no, *it isn't really my insurance*.

(Tr. 668)(emphasis supplied).  Paul insured the Lautrec as the property of the Estate (PX11), and submitted the bill to Victor for payment.  (PX 12).

Paul claims that he was given a very valuable gift at Christmas, 1999, that he knew about the gift, and discussed it repeatedly thereafter with the donor.  The evidence, however, is that he utterly failed to exercise any dominion and control over the putative gift.  Maryland law accords the benefit of a presumption of acceptance to the alleged donee who can establish, by the clearest proof, that transfer of property actually occurred.  Allender v. Allender, 199 Md. 541, 546, 87 A.2d 608 (1952).

Paul, however, has not shown any transfer of the Lautrec, and the proof is inconsistent with acceptance, or indeed, even with knowledge, of a gift that he says he knew all about. Maryland law applies stringent standards to claims of *inter vivos* gifts made against the estates of decedents, and there is no decision by the courts of that State that permits evidence otherwise barred by the Dead Man's Statute where the presumption has failed.

### 3. Paul Genecin has failed to establish delivery of the deed of gift to the Lautrec within Rita Genecin's lifetime.

No one other than Paul Genecin testified to the delivery of DX 501 to Paul Genecin within Rita Genecin's lifetime, and his testimony is inadmissible under the Dead Man's Statute. As discussed in Part II.B.2.b. above, the many falsehoods in connection with the notarization of DX 501 preclude a finding, by the clearest proof, that Ms. Mulrine performed her admittedly false notarization of the document within Rita Genecin's lifetime. As discussed in Part II.B.2.a. above, Paul Genecin made no mention of DX 501 until after Rita Genecin's death and after he had removed papers from her home. (Tr. 625-9, 716-7, 759-61, 799). Paul's failure to present the "clearest proof" of delivery of his "gift letter" precludes any claim that title to the Lautrec passed to him.

### 4. The January 12, 2000 deed of Rita Genecin's house to herself and her two sons does not establish constructive delivery.

Paul Genecin asserts that his theory of constructive delivery is supported by the January 12, 2000 deed by which Rita Genecin made herself and her two sons joint tenants of her home. (PX 9). Rita Genecin executed this deed, however, in the same meeting with her financial advisers in which she executed PX 5-8, giving shares of one-fifteenth of the Lautrec to each member of Paul's immediate family. Indeed, PX 5-8 were prepared on January 6, 2000, but their execution was deferred until the deed changing ownership of the house was ready. (WAGNER: Tr. 67; HERTZBERG: Tr. 283-4). Thus, Rita Genecin's intent, in changing the ownership of her house, was directly tied to PX 5-8, whose existence shows either that she had no knowledge of DX 501 or that she believed any earlier "gift" of 100 percent of the Lautrec to be revocable. Her financial

advisers, who arranged the re-deeding of the house, had no knowledge until after Rita Genecin's

death of DX 501 or of any other claim that Rita Genecin had made a gift of 100 percent of the

Lautrec.  (WAGNER: Tr. 68, 160, 198-200; HERTZBERG: Tr. 279, 282-4, 317-19), (DX 502).

Thus, there is no basis to infer that Rita Genecin changed the ownership of her house to effectuate

constructive delivery of 100 percent of the Lautrec.  Moreover, since Rita Genecin retained an

ownership in the house and under Maryland law, conveyance of title to a house does not convey title

to its contents; Tishman v. Frazer, 191 Md. 132, 62 A.2d 596 (Md. 1948); the conveyance of the

house did not place the Lautrec wholly under Paul Genecin's power so as to constitute effective

delivery, Dorsey v. Dorsey, 302 Md. 312, 318, 487 A.2d 1181, 1184 (Md. 1985).

## III.    PAUL GENECIN HAS CONCEDED THAT THERE WAS NO DELIVERY OF ANY DOCUMENT GIVING HIM A FRACTIONAL SHARE OF THE LAUTREC.

Any person who purports to be the donee of an *inter vivos* gift made by a decedent has the

burden under Maryland law of establishing each element of a gift by the "clearest evidence."  In this

case, the only claim that any putative donee has sought to prove is Paul's claim that he was given a

gift of 100% of the Lautrec.

Paul has argued vigorously throughout this litigation that the documents purporting to give

him and other members of his family fractional shares of the Lautrec (PX 5-8) are a "nullity."  *See,*

*e.g., Defendant's Memorandum of Law dated December 31, 2003 in Support of Motion for Summary*

*Judgment* at 17.  He has not pleaded a claim to a 1/15[th] share of the Lautrec pursuant to PX 5, nor

has any member of his family sought to intervene in these proceedings to put forward a claim

pursuant to PX 6, PX 7 or PX 8.   This Court has thus not been asked by the interested parties to

adjudicate their rights to fractional shares of the Lautrec.  Paul claims that the fractional share

documents were never delivered to him while Rita Genecin was alive, and that he first learned of

them after her death.  (Tr. 759). Gregory testified, similarly, that he had no knowledge of a gift to

him of 1/15[th] of the Lautrec.  (Tr. 522).  This testimony constitutes admissions by these two potential

claimants that there was no delivery of title to the fractional shares, and no acceptance of same.  *See* Dulany, 105 Md. App. at 631, 660 A.2d at 1053.  The other two potential claimants, Victoria Morrow and Samuel Genecin, did not testify.

The issue of the effectiveness of the fractional share documents has not been placed before this Court.  Under these circumstances, upon a determination that Paul has not established that the Lautrec was an *inter vivos* gift to him, the Court should enter judgment declaring that possession and title are vested in the Estate.

THE PLAINTIFF,
ESTATE OF RITA GENECIN,


By  /s/ David L. Belt
       David L. Belt (ct 04274)
       JACOBS, GRUDBERG, BELT, DOW & KATZ P.C.
       350 Orange Street
       New Haven, CT  06503
       Tel.:(203) 772-3100
       Fax:(203) 772-1691
       Email: dbelt@jacobslaw.com
       Its attorney

**<u>Certification</u>**

The undersigned hereby certifies that a copy of the Corrected Post-Trial Memorandum of

Plaintiff Estate of Rita Genecin was mailed first class, postage prepaid, this 4th day of March 2005

to:

Patrick M. Noonan, Esq.
Delaney, Zemetis, Donahue,
   Durham & Noonan, P.C.
741 Boston Post Rd.
Guilford, CT 06437


                    /s/ David L. Belt
                        David L. Belt