## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

ESTATE OF RITA GENECIN, by     :
VICTOR GENECIN, Personal     :
Representative,     :
    :
          Plaintiff,     :
    :
v.     :    NO.    3:01cv211 (MRK)
    :
PAUL GENECIN and VICTOR GENECIN, :
in his individual capacity,     :
    :
          Defendants.     :

## MEMORANDUM OF DECISION

This lawsuit is the result of an unfortunate and bitter dispute between two brothers, Victor Genecin and Paul Genecin, over the rightful ownership of two assets – a lithograph and an individual retirement account – that once belonged to their mother, Rita Genecin, who is now deceased. Rita Genecin loved her sons very much and undoubtedly was very proud of them. Both are accomplished; one is a doctor and the other a lawyer. But the Court has no doubt that were she alive today, Rita Genecin would be deeply disappointed in her sons. For they have fought each other viciously over these assets when an amicable resolution was always evident, and in the process, they have leveled distressing allegations against each other – charging each other with fraud, falsifying documents and suborning perjury. Worse yet, in their headstrong battle over these assets, it appears that they may have expended more on legal fees than either could possibly hope to recover.

The court system itself did not fail this family. Magistrate Judge William I. Garfinkel,

-1-

who has a well deserved reputation for being able to settle tough cases, plaintively urged the brothers "without Court intervention, . . . [to] fashion a resolution that honors Rita's wishes," and he tried to help them toward that goal. Ruling on Mot. for Prejudgment Replevin [doc. #43] at 2. This Court itself took the extraordinary action of ordering Paul and Victor to meet with each other, along with their lawyers, during the trial to discuss settlement, because, as the Court observed to them at the time, "you owe it to yourselves, you owe it to your children, and you owe it most of all to the memories of your parents to roll up your sleeves and work as hard as you can to come up with solution that is not a vindication, that is not a victory, but . . . that respects each other and your parents, and that is sensible." Tr. at 539. Yet, for their own reasons, Paul and Victor Genecin instead inexplicably chose to bring misery and calumny upon each other.

This self-destructive battle need not have happened. And, as the Court noted at trial, it should have been stopped long ago; not for Victor's and Paul's sake, but rather, for the sake of their children – cousins all – and most of all, because of the memory of their loving parents, Rita and Abraham Genecin. Inevitably, this Court's decision, like all judicial resolutions, will disappoint some. Yet, it remains the Court's fervent hope that Victor and Paul can somehow bring themselves to view this decision as marking the end of a tragic period in their lives and that they will seize the opportunity to stop the fighting and begin the healing process.

## I.

This matter was tried to the Court over the course of several days, and the parties also provided the Court with both pre-trial and post-trial briefing and argument.[1] This Memorandum

---

[1] The trial lasted four days (May 26-28, 2004 and November 22, 2004). *See* Minute Entries [docs. ## 93-95, 100]. The trial transcript is cited in this ruling as "Tr." Plaintiff's exhibits presented at trial are cited in this ruling as "PX" and Defendants' Exhibits are cited as

of Decision will serve as the Court's findings of fact and conclusions of law in accordance with

Rule 52 of the *Federal Rules of Civil Procedure*.   However, rather than list all relevant facts in

detail at the outset, the Court will briefly provide some background information and will provide

additional findings of fact relevant to each disputed issue in the sections that follow.

Rita Genecin died suddenly and unexpectedly on or about August 5, 2000 in her home in

Baltimore, Maryland, two years following the death of her husband Abraham. *See* Tr. at 359,

362.  Rita Gencin is survived by her two sons – Victor, who resides in New York; and Paul, who

resides in Connecticut. *See* Tr. at 359-60.   Victor Genecin is the sole personal representative of

the Estate of Rita Genecin ("the Estate"). *See* Tr. at 357-58.  In her Will, Rita Genecin divided

her residuary Estate as follows: 55% to Victor and 45% to Paul. *See* Tr. at 362.

Throughout her life, Rita Genecin loved art.  She was an artist herself, and, along with her

husband, was an avid collector of art.  Over the years, Abraham and Rita Genecin made gifts to

their sons of many of the works of art that the Genecins had collected.  The most valuable of the

art works Rita Genecin owned in the year preceding her death was an 1897 color lithograph by

French artist Henri de Toulouse-Lautrec entitled *Partie de campagne (Le chariot anglais)* (the

"Lautrec"), which has been appraised as having a value of  $150,000. *See* PX 11 (portion of

Rita's insurance policy); Tr. at 373-74.  At the time of her death, the Lautrec was hanging in the

---

"DX."  Closing argument was held on March 11, 2005. *See* Minute Entry [doc. #118].  In
addition, the parties submitted the following post-trial and pre-trial materials: Joint Trial
Memorandum [doc. #88] ("Joint Trial Mem."); Trial Memorandum of Plaintiff Estate of Rita
Genecin [doc. #92] ("Trial Mem. of Estate"); Trial Memorandum of Defendant Victor Genecin
[doc. #93] ("Trial Mem. of Def. Victor Genecin"); Post-Trial Memorandum of Defendant Victor
Genecin [doc. #113] ("Post-Trial Mem. of Def. Victor Genecin"); Post-Trial Memorandum of
Plaintiff Estate of Rita Genecin [doc. #120] ("Post-Trial Mem. of Estate"); and Defendant Paul
Genecin's Post-Trial Brief [doc. #115] ("Def. Paul Genecin's Post-Trial Br.").

home in which Rita Genecin lived in Maryland. *See* Tr. at 363-64. Immediately following her

death, Paul brought all of the art from the Maryland home to Connecticut for safekeeping while

the Estate was beginning its journey through the probate process. *See* Tr. at 370-71.

Thereafter, Paul informed his brother Victor, the Estate's personal representative, and

others, including Rita Genecin's personal lawyer and financial advisors, that his mother had given

him the Lautrec as Christmas gift during a visit that he and his family made to Rita's Maryland

home in late December 1999, approximately six months before her death. *See* Def. Paul

Genecin's Post-Trial Br. at 1; Tr. at 375-76 (Victor testified that he first heard of Paul's claim "in

early September of 2000 and the person I heard from was Max E. Blumenthal."). Victor

Genecin, as personal representative of the Estate, denied that his mother had made a legally valid

gift of the Lautrec to Paul, and Victor brought this action on behalf of the Estate in Connecticut

federal court to regain possession of the Lautrec for the Estate.[2] *See* Compl. [doc. #1] at 1.

Sadly, in pursuing that claim on the Estate's behalf, Victor has also been compelled to deny the

effectiveness of a gift of two lithographs by French artist Edouard Vuillard entitled *Maternite* and

*Avenue* that his mother appears to have intended to give him in January 2000 in the same manner

that she gave Paul the Lautrec. *See* Tr. at 295, 375; Compl. [doc. #1] at 8, ¶ 39.

Also at issue is this action is the appropriate distribution of funds from an Individual

Retirement Account with Charles Schwab & Company, Inc. ("the Schwab IRA") that was held in

Rita Genecin's name at the time of her death. *See* Compl. [doc. #1] at 18. Fueling the

controversy over the Schwab IRA are three documents – an IRA application and two IRA

---

[2] On September 23, 2002, Judge Garfinkel granted the Estate's Motion for Prejudgment
Replevin [doc. #12] and ordered Paul to return the Lautrec to the Estate during the pendency of
this action. *See* Ruling on Mot. for Prejudgment Replevin [doc. #43].

beneficiary designations – that appear to have been signed and executed by Rita Genecin.  *See*

DX 607, DX 608, DX 610.  In his individual capacity and principally invoking the IRA

application, Victor Genecin argues that he is entitled to 60% of the Schwab IRA.  *See* Post-Trial

Mem. of Def. Victor Genecin at 2.  Paul Genecin contends that the two IRA beneficiary

designations signed by his mother require an even 50-50 division of the Schwab IRA.  *See* Def.

Paul Genecin's Post-Trial Br. at 1.  Both seek a declaration of their respective rights, if any, in the

Schwab IRA.  The Estate takes no position on the matter.  Nor has Schwab, which has

maintained possession of the IRA funds during the pendency of this action.  *See* Letter of

12/20/00, Ex. D to Compl. [doc. #1] at 1 ("Given this discrepancy . . . Schwab is unable to

allocate the balance of the IRA without clarification from the parties.").

## II.

Before addressing the claims in this case – and heeding the Second Circuit's admonition

that it "is the obligation of a court, on its own motion, to inquire as to subject matter jurisdiction

and satisfy itself that such jurisdiction exists" – the Court pauses to explain how a federal court in

Connecticut has subject matter jurisdiction over this dispute between an Estate and two heirs.

*Da Silva v. Kinsho Int'l Corp.*, 229 F.3d 358, 361 (2d Cir. 2000).  Neither party has raised any

objection to the Court's subject matter jurisdiction in this case.  And, as the parties agree, the

Court's subject matter jurisdiction in this case is based upon the fact that there is complete

diversity of citizenship between the Estate,[3] Paul and Victor, and the amount in controversy

---

[3] "In diversity actions involving estates, the courts look to the citizenship of the decedent
to determine jurisdiction." *Golden ex rel. Golden v. Golden*, 382 F.3d 348, 352 (3d Cir. 2004).
*See* 28 U.S.C. § 1332 (c)(2) ("the legal representative of the estate of a decedent shall be deemed
to be a citizen only of the same State as the decedent").

exceeds $75,000.  *See* 28 U.S.C. § 1332; Compl. [doc. #1] at 1-2.

Nevertheless, given the subject matter of this case, the Court must *sua sponte* consider whether the so-called "probate exception" to diversity jurisdiction applies in this case.  The probate exception arises because "the Supreme Court has held that 'probate matters' are excepted from the scope of federal diversity jurisdiction, 'the reason being that the equity jurisdiction conferred by the Judiciary Act of 1789 . . . which is that of the English Court of Chancery in 1789, did not extend to probate matters.' "  *Moser v. Pollin*, 294 F.3d 335, 340 (2d Cir. 2002) (quoting *Markham v. Allen*, 326 U.S. 490, 494 (1946)).

The Second Circuit has described two situations when the probate exception applies.  The probate exception applies when a "federal court sitting in diversity [is] being asked to directly probate a will or administer an estate."  *Moser*, 294 F.2d at 340.  However, as the Second Circuit has noted, this rarely occurs because "few practioners would be so misdirected as to seek, for example, letters testamentary or letters of administration from a federal judge."  *Id*.  This case is no exception.  The second situation in which the probate exception applies is when a lawsuit is "probate-related" rather than "purely probate in character."  *Id*.  This second basis for the probate exception is implicated when the district court's adjudication would: "(1) 'interfere with probate proceedings;' (2) 'assume general jurisdiction of the probate;' or (3) assert 'control of property in the custody of the state court.' "  *Id*. at 341 (quoting *Markham*, 326 U.S. at 494).

 Preliminarily, the Court notes that the Schwab IRA is indisputably not a probate asset, and therefore the Court's adjudication of the brother's dispute regarding rightful ownership of the IRA does not fall within the probate exception.  *See Halvorsen v. Shieve*, No. 02-CV-6187P, 2004 WL 627939, at *3 n.6 (W.D.N.Y. Feb. 10, 2004) (finding that the probate exception did not

apply because an IRA is a non-probate asset).  The adjudication of the parties' rights with respect

to the Lautrec presents a closer question.  Nevertheless, the Court concludes that the probate

exception is not implicated for several reasons.

First, nothing in this lawsuit asks or requires the Court to assert control over property in

the custody of the state court.  Rather, the Court has been asked to "adjudicate[s] the rights" of

the parties with respect the Lautrec, a function expressly sanctioned by the Supreme Court in

*Markham v. Allen*, *supra*.  There, the Supreme Court held that a federal district court "may

exercise its jurisdiction to adjudicate rights [even in property in custody of a state court] where

the final judgment does not undertake to interfere with the state court's possession save to the

extent that the state court is bound by the judgment to recognize the right adjudicated by the

federal court."  *Markham*, 326 U.S. at 494.

Second, this lawsuit does not present a situation in which this Court would "assume[]

jurisdiction of the probate."  The Second Circuit has explained that "[t]his arises when the federal

district court sitting in diversity entertains a cause of action that under state law . . . would be

cognizable only by the probate court."  *Moser*, 294 F.3d at 341 (citations and quotation marks

omitted).  In Maryland, "the courts and legislature have vested probate jurisdiction in the

orphan's court."  *Marshall v. Lauriault*, 372 F.3d 175, 182 n.7 (3d Cir. 2004) (citing *Radcliffe v.

Vance*, 360 Md. 277 (2000)).  However, the Court of Special Appeals of Maryland has held that

where "a personal representative bring[s]" an action "to recover personal property claimed by

another,"as Victor Genecin has in this case, "such an action must be brought in an appropriate

court of general jurisdiction and not in the Orphans' Court."  *DeFelice v. Riggs Nat'l Bank of

Washington*, 55 Md. App. 476, 479 (Md. Ct. Spec. App. 1983).  Therefore, in ruling on the

dispute regarding the Lautrec, this Court has not assumed jurisdiction over issues that are vested in the Maryland probate court. *See Marshall*, 372 F.3d at 182.

Third and finally, disposition of the issues presented by the lawsuit will not interfere with probate proceedings. Indeed, it is well settled that the fact this Court is asked to adjudicate whether certain assets belong to the Estate "standing alone, does not constitute interference" sufficient to trigger the probate exception. *Ashton v. Josephine Bay Paul & C. Michael Paul Found.*, 918 F.2d 1065, 1072 (2d Cir. 1990) ("Merely determining rights, as opposed to administering assets is not proscribed by the probate exception.") (citing *Markham*, 326 U.S. at 495). While the Orphans' Court "will be obliged to give full faith and credit" to this Court's ruling, the Orphan's Court "will continue to administer" the Estate. *Ashton*, 918 F.2d at 1072; *see Akrotiranakis v. Burroughs*, 262 F. Supp. 918, 923 (D. Md. 1967) (same). Therefore, the probate exception does not prevent this Court from adjudicating the parties' claims in this action.

Satisfied that it has jurisdiction over this dispute, the Court will consider first whether Rita Genecin validly gifted the Lautrec to Paul Genecin before her death. Next, the Court will turn to the conflicting claims regarding the Schwab IRA.

## III.

The parties agree that the validity of the Lautrec gift is governed by Maryland law. The parties also agree on who has the burden of proving a valid inter vivos gift, the standard of proof and the elements of a gift under Maryland law. Under Maryland law, the donee – Paul Genecin – has the burden of establishing every element of a valid gift, he must do so by clear and convincing evidence, and he must establish three elements: "an intention on the part of the donor to transfer the property, a delivery by the donor and an acceptance by the donee." *Park Station*

*Ltd. Partnership, LLLP v. Bosse*, 378 Md. 122, 131 (2003) (quotation marks and citations omitted); *see Brewer v. Brewer*, 156 Md. App. 77, 117 (Md. Ct. Spec. App. 2004) ( "[T]he burden is on the donee to establish every element of a gift, which must be proven by clear and convincing evidence.") (citing *Dorsey v. Dorsey*, 302 Md. 312, 318 (1985)); *Pomerantz v. Pomerantz*, 179 Md. 436, 440 (1941) (same). While an admittedly close question, particularly because of the governing standard of proof, the Court concludes on the basis of the facts as the Court finds them that Paul has sustained his burden of proof on each element. Therefore, the Court finds that Rita Genecin made a valid gift of the Lautrec to Paul Genecin in December 1999.

## A.  Donative Intent

" 'In order to prove donative intent, it must be shown from the evidence that the donor clearly and unmistakably intended to permanently relinquish all interest in, and control over the gift.' " *Brewer*, 156 Md. App. at 116 (quoting *Dorsey*, 302 Md. at 318); *see Schilling v. Waller*, 243 Md. 271, 277 (1966). The Court concludes that Paul Genecin established by clear and convincing evidence that his mother intended to give him the Lautrec in December 1999.

In reaching this conclusion, the Court emphasizes at the outset that it did not rely on Paul's testimony regarding his mother's gift. At trial, and with the agreement of all parties, the Court allowed Paul to testify freely in order to create a full record for a possible appeal, subject to the Estate's continuing objection that Paul's testimony about his conversations and interactions with his mother was barred by Maryland's Dead Man's Statute, Md. Code Cts. & Jud. Proc., art. § 9-116. The Court now sustains the Estate's objection and rules that with one exception noted below, Paul Genecin's testimony is barred by Maryland's Dead Man's Statute, which serves to

"impose[] silence on interested parties as to transactions with or statements by the decedent."

*Reddy v. Mody*, 39 Md. App. 675, 679 (Md. Ct. Spec. App. 1978).[4]

> The Maryland Dead Man's Statute provides as follows:
>
> A party to a proceeding by or against a personal representative, heir, devisee, distributee, or legatee as such, in which a judgment or decree may be rendered for or against them, or by or against an incompetent person, may not testify concerning any transaction with or statement made by the dead or incompetent person, personally or through an agent since the dead, unless called to testify by the opposite party, or unless the testimony of dead or incompetent person has been given already in evidence in the same proceeding concerning the same transaction or statement.

Md. Code Cts. & Jud. Proc., art. § 9-116.  As the Dead Man's Statute is a rule of substantive law and not purely an evidentiary principle, the statute applies in diversity cases under the rule of *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938).  *See Rosenfeld v. Basquiat*, 78 F.3d 84, 88 (2d Cir. 1996); *Clark v. Meyer*, 188 F. Supp. 2d 416, 420 n.16 (S.D.N.Y. 2002).  And because Paul Genecin is a party to this action and sought to testify about "transaction[s] with or statement[s] made by" his deceased mother, the plain language of Maryland's Dead Man's Statute bars his testimony.  *See Farah v. Stout*, 112 Md. App. 106, 115-116 (Md. Ct. Spec. App. 1996).

The one exception to the statutory bar on Paul Genecin's testimony is his identification of Rita Genecin's signature on the deed of gift, see DX 501, which is discussed below.  Paul positively identified his mother's signature on the document.  *See* Tr. at 573-74; 612-13.  For that matter, so did Victor.  *See* Tr. at 379.  Therefore, strictly speaking, Paul's testimony on the matter

---

[4] For appellate purposes, the Court notes that if the Court is wrong on the application of the Dead Man's Statute to Paul Genecin's testimony, the Court found his testimony about his conversations with his mother and the reasons he did not bring the painting to Connecticut before his mother's death credible and fully supportive of his claim that his mother gave him a gift of the Lautrec in December 1999.

may not have been needed. However, Maryland courts have long recognized that testimony limited to identifying documents or signatures is not barred by Maryland Dead Man's Statute. *See, e.g.*, *Stacy v. Burke*, 259 Md. 390, 406 (1970) (by identifying signatures appearing on a letter as genuine, witness was "not testifying in regard to any transaction had with or statement made by" decedent and therefore the testimony was not barred by Dead Man's Statute); *Montgomery County v. Herlihy*, 83 Md. App. 502, 514 (Md. Ct. Spec. App. 1990) ("identification of documents by a party is not tantamount to testifying to a transaction with or a statement by the decedent").

The Court also concludes that the testimony of Gregory Genecin, Paul's son, is not barred by Maryland's Dead Man's Statute. Because the Dead Man's Statute is an exception to Maryland's general rule that all witnesses are competent to testify, it "is strictly construed" by Maryland courts, and "[i]n close cases, involving the state's Dead Man's Statute, Maryland precedent consistently has favored the admission of testimony." *Walton v. Davy*, 86 Md. App. 275, 285 (Md. Ct. Spec. App. 1999) (quotation marks and citations removed). Thus, although Maryland courts have emphasized that if the Dead Man's Statute is to be altered, the Maryland General Assembly must do it, the courts candidly "depart[] from that premise . . . by strictly construing the statute in an effort to disclose as much evidence as the rule will allow." *Trupp v. Wolff*, 24 Md. App. 588, 598 (Md. Ct. Spec. App. 1975).

For the purposes of the Dead Man's Statute, "a party is one who has an interest in the property sought or a person having a direct pecuniary and proprietary interest in the outcome of the case." *Reddy*, 39 Md. App. at 682 (citing *Trupp*, 24 Md. App. at 602). However, "the persons excluded from testifying are not those with an interest of any sort, but rather traditional

-11-

real parties in interest and their representatives." *Id*. Thus, "[t]he spouse or child of a party has been permitted to testify in his or her spouse's or parent's favor, for example, even though the witness possibly stood to benefit in the proceedings." *Farah*, 112 Md. App. at 115-116 (collecting cases).

The Estate rightly does not argue that Gregory Genecin's indirect interest in the Lautrec through his father bars his testimony under Maryland's Dead Man's Statute. *See* Mot. in Limine to Preclude Testimony of Gregory Genecin [doc. #87] at 2. Instead, the Estate asserts that Gregory Genecin's testimony should be precluded on the basis of his direct interest in the Lautrec based on certain fractional deeds of gift to the Lautrec which Rita Genecin executed (but never delivered) to Gregory and the other members of Paul's family in January 2000. *See id*; PX 5-8.

The Court will discuss the fractional gifts below. Suffice it to say for present purposes that the Estate's argument based on the fractional share documents fails for two reasons. First, neither Paul, Gregory, nor anyone else is pressing the validity of the fractional gifts in this litigation. *See* Def. Paul Genecin's Post-Trial Br. at 3-4. In fact, Gregory's testimony at trial was that his grandmother gave the Lautrec in its entirety to his father Paul, and not to him. *See* Tr. at 521-22 ("No, she gave it to my dad, not me."). Second, even if the validity of the fractional gifts had been pressed in this litigation, it is undisputed that the fractional deeds of gift were never delivered to the recipients and that the recipients did not even know of their existence until after Rita Genecin's death. *See* Def. Paul Genecin's Reply Br. in Supp. of Mot. for Summ. J. [doc. #77] at 6. In short, the Court is not aware of any direct claim to any portion of the Lautrec asserted by Gregory Genecin; nor can the Court say that he would have even a colorable claim to the Lautrec on the basis of the facts and Maryland law. *See* discussion in Parts III.B-C *infra*.

-12-

Accordingly, the Court overrules the Estate's objection to Gregory Genecin's testimony under Maryland's Dead Man's Statute because the Court finds that he is not a "party" within the meaning of that statute. *See, e.g.*, *Walton*, 86 Md. App. at 285-86; *Reddy*, 39 Md. App. at 682; *Trupp*, 24 Md. at 599-600.[5]

Having resolved these threshold evidentiary issues, the Court now turns to the evidence of donative intent. The admissible evidence presented at trial was overwhelming that Rita Genecin intended to give the Lautrec to Paul as a Christmas gift in December 1999. First, and most importantly, there is a deed of gift, which was undisputedly executed by Rita Genecin on or about December 1999, which states that "I, Rita Genecin, hereby give, grant, convey and transfer all my right, title and interest in and to the item listed below to you, Paul Genecin in fee simple, absolutely, without any reservations whatsoever." *See* DX 501. It is difficult for the Court to conceive of a clearer statement of Rita Genecin's intent than that contained in the deed of gift which she signed. Although there was considerable testimony about defects in the notarization of this document, the Court finds that evidence largely irrelevant given that Rita Genecin's signature on the deed of gift was verified at trial by her sons, Paul, see Tr. at 612-13, and Victor, the personal representative of the Estate, see Tr. at 379.[6] *See also* Tr. at 488 (Marion Mulrine,

---

[5] The Estate also objected in its post-trial brief to testimony of Gregory Genecin and Matilda Sherlock (Rita Genecin's close friend and neighbor) that Rita told them in the spring of 2000 that she had gifted the Lautrec to Paul at Christmas 1999. In its post-trial brief, the Estate objected to this testimony on the basis of the hearsay rules. However, the Estate did not assert any hearsay objection to this testimony at trial, and therefore, the Court deems any such objection to have been waived. *See, e.g.*, *United States v. Tarricone*, 996 F.2d 1414, 1423 (2d Cir. 1993) ("Balagula has waived his argument that Quock's testimony was inadmissible hearsay because he failed to raise that objection at trial.").

[6] It is well established that handwriting can be authenticated by a lay witness, so long as the witness's familiarity with the handwriting in question was not acquired for purposes of the

Paul's secretary testified that "[Paul] swore it was his mother's signature.").

The Court finds it significant that the testimony and evidence showed that over the years Rita Genecin had made numerous gifts of art to Paul using deeds of gift nearly identical to the one at issue in this case. *See* DX 503-07. The Estate does not challenge the validity of any of those identical deeds of gift. In particular, the Estate does not challenge the validity of Rita Genecin's deed of gift in which she gave to Paul a wood cut print by Japanese artist Shiko Munakata entitled *Hawk Woman*. The Munakata deed of gift was executed by Rita Genecin on the same date as the identically worded Lautrec deed of gift. *See* DX 507; Tr. at 380. Yet, the Estate does not contest it. In fact, in order to find that the Lautrec deed of gift was invalid, the Court would have to conclude from the evidence that Paul Genecin forged the document and committed fraud on the Court by presenting the document in this litigation. Sadly, the Estate advanced precisely this claim at oral argument. The Court emphatically rejects this claim as pure speculation that is unsupported by the evidence.

Rita Genecin's intent to give the Lautrec to Paul Genecin was further evidenced by the testimony of three witnesses: Gregory Genecin; Ms. Sherlock, and Victor Genecin himself. The Court found Gregory Genecin to be a credible witness. He testified that after visiting an art museum with his grandmother during a family trip to Washington in March of 2000, his grandmother told him that "she gave [the Lautrec] to my dad at Christmas." Tr. at 520. Ms. Sherlock – who was the only truly disinterested witness to testify – also testified with great

---

litigation. *See* Rule 901(b)(2) of the *Federal Rules of Evidence*; *United States v. Tipton*, 964 F.2d 650, 655 (2d Cir. 1992) (lay witness familiar with party's handwriting was qualified to identify the handwriting); *Ladson v. Ulltra East Parking Corp.*, 878 F. Supp. 25, 29 (S.D.N.Y. 1995) ("non-expert identification of the handwriting on the document satisfies the authentication requirement, assuming competency on the part of the identifier").

sensitivity and credibility. Ms. Sherlock testified that during a visit with her dear friend Rita Genecin in the spring of 2000, Ms. Sherlock observed that the Lautrec had been moved from its usual place in the Genecin home. When Ms. Sherlock noted the move to Rita, Rita explained that she had "given [the Lautrec] to Paul for Christmas." Tr. at 495. Significantly, Victor Genecin also conceded at trial that it was his view that his mother had intended to gift the Lautrec to Paul and/or his family. Thus, when asked "I take it it's your understanding that your mother wanted Paul to ultimately own 100 percent of the Lautrec, Paul and/or his family?" Victor testified, "It certainly appears that that was her intention in January of 2000 when she executed those documents." Tr. at 383-84.

In the Court's view, the Estate did not present any evidence that successfully negated Rita Genecin's intent as expressed in the deed of gift and as confirmed by the testimony of the other witnesses (though the Court hastens to add that it was not the Estate's burden to negate a gift but rather Paul Genecin's burden to establish the gift). Indeed, absent at trial was any testimony by Victor Genecin regarding a single conversation he had with his mother regarding the Lautrec. Nor did the Court hear any testimony from any other witness indicating that Rita Genecin did not intend to give the Lautrec to Paul Genecin. Instead, the Estate's rebuttal case essentially asked the Court to draw a number of negative inferences from certain evidence in an apparent attempt to defeat Paul's claim on the basis of the clear and convincing standard of proof. The Estate's efforts are unpersuasive.

First, the Estate presented evidence regarding certain fractional deeds of gift, see PX 5-8, that Rita executed in early January after executing the December 1999 deed of gift giving the Lautrec to Paul "in fee simple absolute." *See* DX 501. These fractional gifts, the Estate argues,

-15-

show that Rita intended to give the Lautrec not to Paul alone, but to Paul and his family members, and that she intended to convey ownership of the Lautrec over time, not in December 1999, an intent that was defeated by her untimely death. Although the Court agrees that the Estate has provided one plausible interpretation for the subsequent fractional deeds, the Court does not find the Estate's theory the most compelling explanation. The explanation that the Court found far more persuasive is that Rita Genecin intended to give Paul full ownership of the Lautrec when she executed the deed of gift in December 1999 and that the subsequent fractional deeds – which were the brainchild of her financial advisor – were executed in order to create documentary evidence that would allow Rita Genecin to avoid paying gift tax on her gift of the Lautrec.

Victor Genecin, Daniel Wagner of Wagner Capital Management (Rita Genecin's financial adviser) and Mr. Wagner's associate Marc Hertzberg, each testified that it was their understanding that Rita Genecin made the subsequent fractional gifts in an attempt to avoid paying federal gift tax. Mr. Hertzberg testified that Ms. Genecin came to Wagner's offices wanting to give artwork "to her sons" and that while he could not recall "who came up with" the idea of dividing up the Lautrec among Paul's family into fractional shares, he agreed that "the most likely scenario" was that either he or Mr. Wagner suggested the fractional share method to Rita Genecin. Tr. at 279; 292-93. Similarly, Mr. Wagner testified that "[Rita] wanted to give within the gift tax limitations" and he said to her "you would have to divide up the painting . . . We took the $150,000 [appraisal value] and divided by $10,000 per donee per year." Tr. 62-63. *See also* Tr. at 384 (Victor testified affirmatively that the fractional deeds were "an attempt to address" gift tax).

-16-

Rita Genecin's desire to avoid gift tax would also explain why, as the Estate points out, she did not tell her lawyer Max Blumenthal, or Mr. Wagner, about her earlier gift of the entire interest in the Lautrec to Paul. Parenthetically, the Court notes that when Mr. Wagner did learn of the prior deed of gift transferring the entire Lautrec to Paul, he expressed his view that the subsequent fractional deeds were a "non-event," because, as he explained "You can't give away something twice." Tr. at 215. The Court agrees. Furthermore, Rita Genecin's conversations with Gregory Genecin and Ms. Sherlock during which she stated that she had given Paul the Lautrec for Christmas, occurred in the Spring of 2000, months after the fractional deeds of gift were executed. *See* Tr. 495, 520; PX 5-8. Had Rita Genecin truly intended to give the Lautrec to Paul and also to his family members and to do so over time, she would not have made those statements to Gregory Genecin and Ms. Sherlock. Finally, Rita Genecin never delivered the fractional gifts to the donees. Surely she would have done so had she truly intended to make the fractional gifts to the members of Paul's family. That she did not do so further supports this Court's finding that Rita Genecin executed the factional deed of gift as a gift tax avoidance device and that they were not intended to supplant or negate Rita Genecin's December 1999 gift of the entire Lautrec to Paul Genecin.

Second, the Estate presented a typewritten document that appeared to be prepared by Rita Genecin, listing each piece of her artwork and often noting next to it the name of the person to whom she had gifted artwork over the years. *See* PX 27. As the Estate points out, notably absent from this list is any notation indicating that Rita had given Paul the Lautrec. Indeed, the Lautrec is the only art work for which Paul has produced a deed of gift from his mother, but for which there is no confirming notation on the list. *See id*; Post Trial Mem. of Pl. Estate [doc. #120], at

-17-

13. From this the Estate would like the Court to draw the negative inference that absence of Paul's name next to the Lautrec indicates that his mother did not intend to give him the Lautrec.

While the omission of Paul's name next to the Lautrec on this list is indeed perplexing, the Court does not find that this fact undermines the otherwise overwhelming evidence of Rita Genecin's intent. There has been no evidence presented that would establish when this list was created or for what purpose it was created. While the Estate suggests that Rita Genecin's notations served to confirm her past actions, it is equally likely that the notations represented her future intentions and that she had not updated the list since deciding to give the Lautrec to Paul. Of course, that is just one of countless possible theories. Without more, the Court will not speculate as to when and for what reason the list was created or why Paul Genecin's name was not listed next to the Lautrec, and the Court will certainly not allow such speculation to negate or outweigh the otherwise competent and compelling evidence that Rita Genecin intended in December 1999 to make Paul a gift of the Lautrec.

Third and finally, the Estate argues that Rita Genecin's failure to deliver the Lautrec to Paul also negates her donative intent. The Court agrees that the ultimate purpose of the delivery requirement is to perfect or evidence donative intent. *See, e.g.*, *Billingsley v. Kelly*, 261 Md. 116, 125 (1971) (stating that the purpose of "[s]tringent requirements of delivery and possession in . . . gift cases is to avoid fraud by requiring the best possible evidence of intent."). However, in the interest of clarity, this Court will address the delivery requirement in Part III.C, *infra*.

For the reasons previously stated, therefore, Court finds that Paul Gencin has established by clear and convincing evidence that Rita Gencin intended to give him the Lautrec in its entirety in December 1999.

## B.  Acceptance

The Court also finds that Paul Genecin has met his burden of establishing acceptance in this case.  To begin with, "[a]cceptance by the donee . . . is presumed, barring evidence to the contrary."  *Brewer*, 156 Md. App. at 117 (citing *Dorsey*, 302 Md. at 318 (citations omitted)).  The Estate presented no evidence to the contrary at trial.  And while Maryland's Dead Man's Statute may bar testimony from Paul Gencin regarding what his mother said to him, there is nothing to prevent the Court from crediting the testimony of his assistant, Ms. Mulrine, that she saw the deed of gift in Paul's possession in New Haven in early January 2000.  *See* Tr. at 466-67.  Nor does the Dead Man's Statute bar Paul's testimony that he did for a time, have the deed of gift in his possession and that he gave it to Ms. Mulrine to notarize in January 2000.  *See* Tr. at 613-14.  The deed of gift itself was plainly admissible and was in fact admitted into evidence.  Under these circumstances, Paul's testimony that he had the deed in his possession does not undermine or frustrate the purpose of the Dead Man's Statute.  *See Stacy*, 259 Md. at 406; *Farah*, 112 Md. App. at 114 ("The purpose of the dead man's statute is to seal the lips of a party . . . about facts *that could be disputed only by the deceased*.") (emphasis added) (citations omitted).  In any event even ignoring Paul's testimony in this regard, it is undisputed that the original deed of gift was produced by Paul in this litigation.  *See* DX 501.  The Court is not prepared to accept the Estate's speculation that Paul obtained possession of the deed of gift only after going through his mother's papers in August 2000 following her death.  Therefore, the Court finds that Paul Genecin has satisfied the acceptance requirement.

## C.  Delivery

In a very real sense, the adequacy of delivery has always been the critical issue in this

case. *See Schenker v. Moodhe*, 200 A. 727, 728 (Md. 1938) ("The validity of the alleged gifts depends upon the legal sufficiency of the deliveries."). Victor Genecin made this point crystal clear at trial when he was asked to explain why the Estate was not pursuing any claim with respect to the Munakata woodcut entitled *Hawk Woman* for which Rita Genecin executed a deed of gift to Paul at the same time as the Lautrec deed of gift. The reason, Victor confirmed, is that "the *Hawk Woman* was actually delivered to [Paul]; whereas the Lautrec was not." Tr. at 380-81.

The facts supporting delivery in this case are undisputed. As the Court mentioned earlier, although Rita Genecin did not physically deliver the Lautrec lithograph to Paul,[7] she did execute and deliver to him (as she had often in the past) a very formal looking deed of gift. It is also undisputed that on the advice of her financial advisor, Mr. Wagner, and shortly after giving Paul a deed of gift for the Lautrec, Rita Gencin transferred ownership of her house into the names of herself and her two sons, apparently in the belief that this additional step would aid in perfecting her gifts of art to her sons. *See* Tr. at 63-64. Thus, Mr. Wagner testified in the context of the fractional deeds of gift, "[W]e talked about moving the title to the house and effectively did it into the name of Paul, Rita and Victor Genecin as owners." Tr. at 63. Similarly, Mr. Hertzberg testified that "I recall Mr. Wagner advising Mrs. Genecin . . . that ownership of the house . . . should be changed to joint ownership with her two sons" in order to perfect her gift of the Lautrec. Tr. at 281-82. Thus, although the Lautrec lithograph itself never left the home where it had hung before the Christmas 1999 gift to Paul, after January 2000, the Lautrec hung in a home which Paul jointly owned.

_____

[7] Paul explained why this was so in his testimony, see Tr. at 643-48 but the Court has now ruled that his testimony was inadmissible. Therefore, the Court has ignored it for purposes of this ruling.

On these facts, there is no question that if the *Restatement (Third) of Property: Wills and Other Donative Transfers* § 6.2 (2003) governed, the delivery requirement for a completed gift would be satisfied.  For the *Restatement* explicitly recognizes inter vivos transfers of property through delivery of a written instrument such as the deed of gift executed by Rita Gencin in this case.  Section 6.2 of the *Restatement* provides: "The transfer of personal property, necessary to perfect a gift, may be made (1) by delivering the property to the donee *or* (2) by inter vivos donative document."  (emphasis added).  Recognizing this latter method of effectuating delivery hardly represents a radical departure from existing law by the *Restatement* drafters.  To the contrary, that method of satisfying the delivery requirement has long been embraced by courts of many jurisdictions.  *See, e.g.*, *Lefrooth v. Prentice*, 202 Cal. 215, 224 (1927) ("There is likewise no question but that delivery may be symbolical such as delivery of a written instrument without physical delivery ."); *Humphrey v. Ogden*, 53 Colo. 309, 311 (1912) ("[A] gift of personal property, evidenced by a written instrument executed and delivered by the donor, is valid, without a manual delivery of the property."); *Lewis v. Burke*, 248 Ind. 297, 304 (1967) ("It is almost universally recognized in all jurisdictions under Anglo-American law that a person may give physical personal property by means of a written instrument expressing a present intent to make a transfer of title immediately" so long as "the written instrument or deed of gift, as it is sometimes called, is delivered to the donee"); *Meyers v. Meyers*, 134 A. 95, 96 (N.J. Ch. 1926) ("The gift is valid if made by deed and the deed be delivered with donative intent, though the subject does not accompany the deed. The delivery of the deed is equivalent to a delivery of the subject.").

Indeed, Illustration 19 from the *Restatement* presents facts that are virtually identical to

this case:

> G mails a letter to her son S.  The letter signed by G states: "This is to let you
> know that you now own the painting that hangs in my living room.  You can pick
> it up at your convenience."  This letter is an inter vivos donative document,
> effective when mailed.

*Restatement (Third) of Property: Wills and Other Donative Transfers* § 6.2, cmt. u, illus. 19

(2003).  In fact, the present case is even stronger than the Illustration in view of Rita Genecin's

gift to Paul of an ownership interest in the home in which the lithograph would hang until her

untimely death.

Of course, the question in this case is whether a valid delivery has been effected under

Maryland law.  While the Estate argues that Maryland does not recognize transfer of moveable

personal property through delivery of a donative writing, a more accurate assessment of the state

of Maryland law is that Maryland courts have not yet had occasion to decide this issue presented

by this case.  Indeed, neither the parties nor the Court have been able to identify a Maryland case

directly on point.  Therefore, the Court must make an "*Erie* guess" as to whether Maryland courts

would adopt the approach espoused by the *Restatement*.  Although the Court candidly admits that

the answer to that question is not entirely clear, the Court is nonetheless satisfied that Maryland

courts would look to the *Restatement* for guidance in resolving this case and that they would

adopt the *Restatement*'s approach of recognizing that the delivery requirement can be met by inter

vivos delivery of a donative document.  The Court reaches this conclusion for several reasons.

First, delivery by donative instrument is simply a natural application of the doctrine of

constructive delivery that has long been recognized by Maryland courts.  Maryland law requires

"a delivery transferring the donor's dominion over the property without power of revocation or

retention of dominion over the subject of the gift."  *Brewer*, 156 Md. App. at 116-117 (quotation

-22-

marks and citations omitted); *Rogers v. Rogers*, 271 Md. 603, 607 (1974) ("[T]he delivery must transfer the donor's dominion over the property."). However, Maryland courts recognize that delivery may be "actual or constructive." *Schenker*, 200 A. at 728. "[T]he concept of constructive delivery evolved from the gift of items too difficult to deliver physically, such that the only practicable way to deliver the item was symbolically." *Hamilton v. Caplan*, 69 Md. App. 566, 574-75 (Md. Ct. Spec. App. 1987). Therefore, the rule governing constructive delivery in Maryland is often stated to be "subject to this qualification, that, while the delivery may be constructive, 'it must be as nearly perfect and complete as the nature of the property and the attendant circumstances and conditions will permit.' " *Id.* (citing *Brooks v. Mitchell*, 163 Md. 1, 12 (1932)); *Merriken v. Merriken*, 87 Md. App. 522, 541-42 (1991) (same).

Maryland courts have acknowledged a wide variety of acts as constituting constructive delivery. Thus, over the years, Maryland courts have embraced constructive delivery of a bank account by transfer of a bankbook, constructive delivery of the contents of a trunk by transfer of a key to the trunk, and constructive delivery of the proceeds of an insurance policy by delivery of the policy documents. *See Hamilton*, 69 Md. App. at 574 (collecting cases). These cases demonstrate that Maryland has rejected unduly rigid manual delivery requirements in favor of constructive delivery rules that serve to effectuate the donor's intent and prevent fraud. For example, there clearly are many "practicable" ways to deliver the contents of a cupboard or trunk – the items can simply be taken out and given to the donee. Yet, Maryland courts have said that in those circumstances, giving the donee the key to the cupboard or the trunk will suffice. *See Goulding v. Horbury*, 85 Me. 227 (1892) (cited approvingly in *Hamilton*, 69 Md. App. at 574). The Court therefore concludes that the oft-quoted standard that constructive delivery must be "as

nearly perfect and complete as the nature of the property and the attendant circumstances and

conditions will permit" is a flexible one, and that "[w]hat constitutes delivery depends largely on

the intent of the parties." *Hamilton*, 69 Md. App. at 575. Indeed, Maryland's highest court has

cautioned that "hard and fast" rules of delivery "are to be applied in a manner which will not

frustrate a clear manifestation of intent." *Malloy*, 265 Md. at 465. Yet, that is precisely what

would happen if the Court rejected Rita Genecin's gift of the Lautrec because Paul did not

immediately take the lithograph to Connecticut, as he did the Munakata.

Second, the Court believes (as do the *Restatement* drafters) that delivery by transfer of a

clearly worded donative writing can satisfy the concerns underlying Maryland's delivery

requirement. The chief concern of the courts in the case of a purported inter vivos gift where the

donee has not taken possession of the gifted property is that the donee is simply committing fraud

in asserting that a gift was made at all. As Maryland's Court of Appeals has long noted, "the

requirement of actual delivery is the only substantial protection [against fraud], and the courts

should not weaken it by permitting the substitution of convenient and easily proven devices."

*Schenker*, 200 A. at 730 (quotation marks and citations omitted). Indeed, many Maryland cases

in which courts have found gifts to fail for lack of physical delivery address situations in which

evidence of the alleged gift is purely oral and the putative donor has done nothing at all to

memorialize or evidence his or her donative intent. For example in *Merriken v. Merriken*, *supra*,

the court held that testimony that a purported donee's father-in-law had built a house as a gift for

her family alone did not establish that a gift had been made. *Merriken*, 87 Md. App. at 541.

Similarly, in *Pomerantz v. Pomerantz*, s*upra*, the court refused to find that a father had given his

daughter the balance of a bank account based on her testimony alone, where the father had failed

to transfer his passbook to his daughter.  *See Pomerantz*, 179 Md. at 439-41.  *See also, Schenker*, 200 A. at 730 (putative donee's testimony alone was insufficient to establish that donor had made an oral gift where she never took any of the gifted items into her possession).

However, as the *Restatement* drafters recognize, the evidentiary function of the delivery requirement can be equally well served by an effective donative instrument.  The New York Supreme Court, Appellate Division persuasively made this point in *Gruen v. Gruen*, 488 N.Y.S.2d 488, 403-04 (N.Y. App. Div. 1984), a case with facts strikingly similar to this one. The court in *Gruen* held that a father had successfully given a painting by artist Gustav Klimt to his son by sending him a gift letter, stating that "it is the delivery of the [written] instrument itself which fulfills the 'delivery' requirement of a gift *inter vivos*, and duplicative manual delivery is therefore unnecessary." *Id.* at 403.  As the court explained, "in the case of an oral gift, the fact of delivery serves to assist, in an evidentiary manner, to confirm the intent of the donor, and to prevent the assertion of fraudulent claims. . . . No such policy considerations are applicable to a gift made in writing." *Id*. at 404; *see also Lewis*, 248 Ind. at 304 ("To us it appears the [gift by delivery of writing] in this case is one to prevent any question of fraud. On the other hand, the physical possession of property, which must be explained by oral testimony of witnesses after the death of an individual, opens the door to more possibilities than does the written instrument in the present case.").

Here, the Court finds that there has been no fraud and that Rita Genecin made her intent to give the Lautrec to Paul clear and unmistakable in numerous ways, including taking the rather extraordinary action of transferring ownership of her home to her two sons (to whom she had gifted art that remained hanging in the home).  Like the drafters of the *Restatement*, the Court

does not believe that it will encourage fraud to recognize that when a donor signs an instrument that clearly gives absolute ownership of a painting to a donee, delivers that instrument to the donee and (in this case at least) conveys to the donee a joint interest in the home in which the painting hangs, the donor has done more than enough to confirm an intent to make a gift.

Another reason to insist on physical delivery is to impress upon the donor that the gift now belongs to the donee and to ensure that the donor intended the gift to be irrevocable.  *See Rogers*, 271 Md. at 607 ("There cannot be reserved a locus potentiae which is a power to revoke the gift or a dominion over the subject of the gift."); *Pomerantz*, 179 Md. at 439-440 (refusing to recognize "a gift where there is reserved to the donor . . . a power of revocation . . . over the subject of the gift.").  However, a donative writing is certainly capable of serving a similar function.  As the court recognized in *Gruen*, "the delivery of a written conveyance . . . requires a high degree of deliberation on the part of the donor, substantially higher than a manual delivery, and affords the clearest and most convincing evidence of the fact that the gift has taken place." *Gruen*, 488 N.Y.S.2d at 404 (quotation marks and citations omitted).  Similarly, the *Restatement* explains that, once a donee has a deed of gift in his possession, the gift is complete and irrevocable, and he may demand physical possession of the gifted property at any time. *See Restatement (Third) of Property, Wills and other Donative Transfers* § 6.2 cmt. w, illus. 22 (2003).  Here, the language of the deed of gift could not have been clearer: " I, Rita Genecin, hereby give, grant, convey and transfer all my right, title and interest in an to the item listed below to you, Paul Genecin, in fee simple, absolutely without any reservations whatsoever."  DX 501.  That language was more than sufficient to underscore the nature and extent of Rita Genecin's act.

Third, Maryland courts have also recognized that once a valid delivery takes place, a donor's physical retention of gifted property does not necessarily invalidate the gift. *See Hamilton*, 69 Md. App. at 578 ("[i]f there is a proper delivery, the donor of a gift can relinquish title to a vested remainder and at the same time retain a present interest in the property . . .") (quotation marks and citations omitted).  For example, in *Smith v. Acorn*, 32 A.2d 252 (D.C. App. 1943), the court, when called upon to interpret Maryland law, stated that "the delivery of a bill of sale or written evidence of title, with a donative intent, is a sufficient delivery of the property, although it may be the intent of the parties that the property itself is to be retained in the possession of or enjoyed by the donor during his life." *Id*. at 254 (holding that delivery of certificate of title was sufficient to establish delivery of an automobile).  *See also Tierney v. Corbett*, 13 D.C. (2 Mackey) 264 (1883) (sustaining gift of a horse where the donor delivered a bill of sale to the donee, but retained the horses in his possession until his death) (cited approvingly in *Smith*, 32 A.2d at 255).

Fourth and finally, a review of Maryland case law shows that Maryland courts generally look favorably upon the *Restatement* and that they have adopted the *Restatement's* position in many other areas of the law.  For example, Maryland courts have adopted the *Restatement (Second) of Conflict of Laws* § 187 (1971), see *Tomran, Inc. v. Passano*,159 Md. App. 706, 720 (2004), the *Restatement (Second) of Torts* § 314A (1965), see *Patton v. United States of America Rugby Football,* 381 Md. 627, 639 (2004), and many portions of the *Restatement of Property*. *See, e.g.*, *Benik v. Hatcher*, 358 Md. 507, 526-27 (2000) (citing with approval *Restatement (Second) of Property, Landlord and Tenant* § 17.6 (1977)); *Boucher Inv., L.P. v. Annapolis-West Ltd. P'ship*, 141 Md. App. 1, 18 (2001) (citing with approval the *Restatement (Third) of*

*Property: Mortgages* § 4.6 cmt. a, at 264 (1996) on permissive waste); *Schovee v. Mikolasko*, 356 Md. 93, 107 (1999) (citing with approval *Restatement (Third) of Property: Servitudes* § 2.14 cmt. b (Tentative Draft No. 1, 1989) on implied negative reciprocal easements). *But see*, *Arundel Corp. v. Marie*, 383 Md. 489, 503-04 (2004) (declining to adopt the "wait and see" approach to the Rule Against Perpetuities advocated by *Restatement (Second) of Property, Donative Transfers* § 1.4 (1977) because Maryland's legislature had expressly spoken on the subject). Therefore, there is no basis in Maryland case law or statutory law to believe that Maryland courts would reject the approach of the *Restatement* and other jurisdictions on the validity of delivery by a donative document.

For the foregoing reasons, the Court concludes that Maryland courts would adopt the *Restatement*'s position on delivery and would recognize that Rita Genecin's delivery of a deed of gift to Paul Gencin (combined with the virtually immediate conveyance of joint ownership to her home) would satisfy the delivery requirements for a valid inter vivos gift. Accordingly, the Court finds that Paul has established by clear and convincing evidence that his mother made him a valid gift of the Lautrec.

## IV.

Unlike the Lautrec, the parties agree that the sole issue regarding the distribution of Rita Genecin's IRA account is Rita Genecin's intent. The question for the Court is whether Rita Genecin intended her Schwab IRA to be distributed evenly between her two sons with each receiving fifty percent, or whether she intended Victor to receive sixty percent of the IRA with Paul receiving forty percent.

The evidence relating to the Schwab IRA is rather thin. First, there are three documents,

all signed executed by Rita Genecin within a three day period and which paradoxically bear

conflicting beneficiary designations. One document is an IRA application bearing Rita Genecin's

signature and dated October 8, 1998 ("the IRA application"). *See* DX 607. The application,

which appears to have been filled out using blue ink, names Victor and Paul as the beneficiaries

of the Schwab IRA and also bears pencil marks next to the "% Benefits" line for each beneficiary

that indicates a 60/40 distribution of the IRA. *Id*; Tr. at 252. This document also has other

information that has been obliterated or erased on the same page as the 60/40 designation.

Also presented at trial were two typewritten IRA documents entitled IRA Beneficiary

Designation,", which also name Victor and Paul as beneficiaries of the IRA and provide for the

IRA to be "distributed to my descendants who survive me, <u>per stirpes</u>." *Se*e DX 608 and DX 610

(emphasis in original). The first such document is dated October 8, 1998 (the "October 8

designation") and was witnessed by Carol Sullivan, an administrator who works for Mr. Wagner

at Wagner Capitol. *See* DX 608; Tr. at 240. Both the October 8 designation and IRA application

were sent by Mr. Wagner's office to Schwab on or about October 8, 1998. Tr. at 241-42. The

other IRA Beneficiary Designation is identical in all respects to the October 8 designation except

that it is dated on October 6, 1998 (the "October 6 designation") and was witnessed by Rita

Genecin's long time attorney, Max Blumenthal. *See* DX 610. The October 6 designation was

sent to Mr. Wagner's office by Mr. Blumenthal on October 18, 1998, with the request that it be

filed with the IRA Administrator. *See* DX 513. However, the October 6 designation apparently

and inexplicably remained in Rita Genecin's file at Mr. Wagner's office until about October 25,

1999, when Mr. Hertzberg discovered it and sent it along to Schwab in accordance with Mr.

Blumenthal's request. *See* Tr. at 286; DX 612.

-29-

The Court also received testimony from three employees of Wagner Capital regarding the IRA: Mr. Wagner, Ms. Sullivan, and Mr. Hertzberg. Ms. Sullivan was involved in preparing Rita Genecin's IRA application and she witnessed Rita's signature on one of the IRA beneficiary designation documents. *See* Tr. at 238-52. Mr. Wagner was present with Rita Genecin in his office while she filled out the IRA application. *See* Tr. at 28, 252. And Mr. Hertzberg transmitted the beneficiary designation documents he found in Rita Genecin's file to Schwab. Tr. at 285-89. The Court also received in evidence a letter from Mr. Blumenthal who apparently prepared the IRA beneficiary designation documents. *See* DX 510.

In the Court's view, the evidence presented in support of Victor Genecin's position that his mother intended a 60/40 distribution of her Schwab IRA was inconclusive. First, physical irregularities on the face of the IRA application itself raise questions in the Court's mind as to the source and validity of the "60%" and "40%" marks that appear on the application. As Ms. Sullivan testified and as the Court had an opportunity to observe, the majority of the application, including Rita's signature on the fourth and final page of the application, appear to have been written in blue ink, whereas the percentage figures in question on the third page of the application appear to have been made in pencil and appear to be the only matter pencilled in on the form. *See* DX 607; Tr. at 250. The Court also found it significant that Rita Genecin's signature does appear anywhere on page three of the application where the percentages are found. In addition, Ms. Sullivan testified that while she witnessed Rita Genecin's signature on the final sheet of the four-page application, she was not physically present in the room when Rita completed and signed the application and that she did not observe who wrote the percentages in pencil next to Victor and Paul's names on the third page of the document. Tr. at 240-42, 252,

256.  Ms. Sullivan did testify, however, that the percentage marks were not consistent with the manner in which those who worked in the Wagner office typically wrote percentages.  *See* Tr. at 257.  In sum, the Court cannot conclude based on the IRA application itself, see DX 607, and Ms. Sullivan's testimony that the "60%" and "40%" markings on the IRA application were made by Rita Genecin or that they represent her intent as to the Schwab IRA.

As for Mr. Wagner's testimony, the Court found his testimony on the subject of the Schwab IRA to be false and entirely incredible.  The Court therefore does not credit Mr. Wagner's testimony about the IRA at all.  Mr. Wagner testified at trial that he observed Rita Genecin place the "60%" and "40%" designations on the IRA application and that she told him that her purpose in designating an unequal distribution was to account for the fact that Victor had three children whereas Paul had only two.  *See* Tr. at 52-54.  However, as Paul Genecin points out at length in his post-trial brief, this testimony is starkly inconsistent with Mr. Wagner's previous actions and testimony on the subject of the Schwab IRA.  Mr. Wagner had never uttered such a story to anyone prior to the trial.  *See* Def. Paul Genecin's Post-Trial Br. [doc. #115] at 13-16.  The Court sees no point in repeating the numerous reasons for discrediting Mr. Wagner's testimony recited in Paul Genecin's brief, in which the Court fully concurs.  Suffice it to say that the Court finds that Mr. Wagner gave untruthful testimony regarding the Schwab IRA at trial, and as a result, the Court did not rely on his testimony in reaching its decision as to Rita Genecin's intent.

It is difficult for the Court to understand why Mr. Wagner would lie on the stand, though the Court has no doubt that he did.  Perhaps he felt guilty over causing this mix-up regarding the IRA designations and saw his testimony as a way to try to solve a problem that he created.  In any

event, for whatever the reason, Mr. Wagner chose to provide false testimony on the issue and as a consequence, the Court feels justified in disregarding it.

By contrast, there was considerable credible and persuasive evidence presented indicating that Rita Genecin intended a "per stirpes" distribution, and that the understanding of Rita Genecin, her attorney and her financial advisors at the time was that a "per stirpes" division would result in an even 50-50 split between Paul and Victor. Significantly, the two IRA designations executed by Rita Genecin do not suffer from the infirmities in the IRA application. *See* DX 608 and DX 610. Both IRA designations are one-page documents clearly bearing Rita's signature at the bottom. Furthermore, Ms. Sullivan testified that she witnessed Rita's signature on the October 8 designation, see Tr. at 240; DX 608, and the October 6 designation was witnessed by Rita Genecin's long-time attorney Mr. Blumenthal as evidenced by his signature on the document. *See* DX 610. No one has suggested that there were any irregularities in the signing or witnessing of these documents. In fact, when asked, "And [the October 6 designation] was witnessed by Mr. Blumenthal who was [Rita's] attorney at that point in time?," Victor Genecin responded, "I believe that to be true." Tr. at 387. As a result, the Court concludes that these designations are valid and are persuasive evidence of Rita Genecin's intent.

Not only do the beneficiary designation documents have stronger indicia of reliability than the pencilled notations on the IRA application, but one of the beneficiary designation documents, the October 6 designation, see DX 610, would be the operative document in any event. The IRA agreement with Schwab provides that "any change or revocation [of a beneficiary designation] must be given in writing to Schwab" suggesting that the writing transmitted to Schwab latest in time would be the operative document. *See* DX 607. In this case,

there is no dispute that the October 6 beneficiary designation was sent to Schwab by Mr.

Hertzberg in late October 1999, see Tr. at 286, and that it was the last document that Schwab

received that addressed the distribution of Rita's Schwab IRA account to her beneficiaries. *See*

Tr. at 396-97. Because the Court concludes, as explained below, that Rita Genecin understood

"per stirpes" to mean an even division of assets between her two sons, the October 6 beneficiary

designation would conflict with the IRA application and thereby revoke it. *See Garner v.

Garner*, 173 A. 386, 388 (Md. 1934) (revocation "need not be an explicit revocation, . . .

revocation may . . . be implied, from a disposition of the property in a second will inconsistent

with that in the first").

        As to the meaning of "per stirpes" in the beneficiary designation documents, the Court

concludes that Rita Genecin intended by that phrase an even distribution between Paul and

Victor. Several items of evidence presented at trial support this conclusion. First, Rita Genecin's

attorney Mr. Blumenthal wrote her a letter dated September 29, 1998 stating that the beneficiary

designation form that she signed "designates Victor and Paul as beneficiaries in equal shares,

which provision that if either of them predeceases [Mrs. Genecin], his share will go to his

descendants." DX 510. The Court finds Mr. Blumenthal's letter, an explanatory letter from an

attorney to his client, to be particularly strong evidence of what Rita Genecin believed the

beneficiary designations she signed meant.

        Second, Mr. Hertzberg testified that his understanding as of December 6, 2000, was that

the per stirpes designation signed by Rita Genecin would result in an even distribution of the

Schwab IRA between Victor and Paul. *See* Tr. at 306. Indeed, that is precisely what both Mr.

Herzberg and Mr. Wagner wrote to Victor and Paul Genecin shortly after discovering the

inconsistent documents in December 2000. *See* DX 514 (letter to Victor and Paul Genecin dated December 6, 2000 states that "Per Stirpes Document . . . divides the IRA equally between the two of you.").

Third, this was Victor Genecin's understanding of "per stirpes" as well, as paragraph 58 of the Complaint which states that "Victor Genecin and Paul Genecin or their successors would each take 50% of the IRA" pursuant to the per stirpes designation. Compl. [doc. #1] at 12. This statement in the Complaint constitutes a judicial admission which is binding on Victor Genecin. *See Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003) (holding that "the allegations in the [complaint] are judicial admission[s] by which Color Tile Committee was bound throughout the course of the proceeding ") (quotation marks and citations omitted); *American Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 351 F. Supp. 2d 79, 96 (S.D.N.Y. 2004) (same).

Finally, the Court notes that the 50-50 interpretation of the "per stirpes" documents is consistent with the definition of the phrase "per stirpes" according to *Black's Law Dictionary* and Maryland statutory law. *Black's Law Dictionary* defines "per stirpes" to mean "[p]roportionally divided between beneficiaries according to their deceased ancestors share." *Black's Law Dictionary* 1164 (7th ed. 1999). Similarly, the Maryland Code provides that "unless a contrary intent expressly appears," a per stirpes designation means that "the property to be distributed shall be divided into as many shares as there are children of the person whose issue are to take by representation or per stirpes." West's Ann. Md. Code, Estates and Trusts § 1-210.1. Thus, under the common understanding of the term "per stirpes," Victor and Paul Genecin would (if they survived their mother, as they did) take one half shares of their deceased mother's one-hundred

percent share in her Schwab IRA.

Victor Genecin advances an alternate theory of the meaning of "per stirpes," arguing that Rita Genecin intended for each of her descendants to receive equal shares of the Schwab IRA. Rita was survived by seven descendants – that is Victor and his three children, and Paul and his two children. Under Victor's theory, Rita Genecin intended for each descendant to receive an equal one seventh share. *See* Trial Mem. of Victor Genecin [doc. #92] at 5. That would leave Victor Genecin's side of the family with four-sevenths and Paul Genecin's side of the family with three-sevenths. Although this theory is a creative one, it is not sufficiently persuasive to overcome the weight of the evidence supporting an equal division as described above. Significantly, it is contrary to the interpretation that Victor Genecin himself initially advanced, it is inconsistent with the meaning of that term provided to Rita Genecin by her lawyer, and it is at odds with the ordinary meaning of the term "per stirpes." *See Black's Law Dictionary* 1156, 1164 (7th ed. 1999) (comparing "per stirpes" which is defined as "proportionably divided between beneficiaries according to their deceased ancestor's share" to "per capita" which is defined as "divided equally among all individuals"). In short, there is no basis in the evidence to believe that Rita Genecin intended anything other than the ordinary meaning of the term "per stirpes" when she signed two separate IRA designation forms on two separate dates that utilized that term.

## V.

In conclusion, the Court finds and declares that Rita Genecin did make a valid gift of the Lautrec lithograph to her son Paul Genecin in December 1999 and the Lautrec is therefore the lawful property of Paul Genecin. The Court also finds and declares that Paul Genecin and Victor

-35-

Genecin are each entitled to receive a fifty percent share of Rita Genecin's Schwab IRA.  **The**

**Clerk is directed to enter final judgment and close this file.**

IT IS SO ORDERED.

/s/ _____Mark R. Kravitz_____
United States District Judge

**Dated at New Haven, Connecticut on <u>March 31, 2005</u>.**